In the Matter of GEORGE L. ROCKWELL, Appellant, *v.* NEWBOLD MORRIS, as Commissioner of Parks of the City of New York, Respondent, and DEPARTMENT OF NEW YORK JEWISH WAR VETERANS OF THE UNITED STATES, INC., Intervenor-Respondent.

First Department, February 14, 1961.

*Emanuel Redfield* for appellant.

*Seymour B. Quel* of counsel (*Saul Moskoff* with him on the brief; *Charles H. Tenney, Corporation Counsel*), for respondent.

*Theodore Brooks* for intervenor-respondent.

BREITEL, J. P. Rockwell, a self-styled American Nazi and, reputedly, a rabid racist, applied to the Commissioner of Parks on May 17, 1960, for a permit to use Union Square Park to make a public political speech the following July 4. The park is located in New York City in a traffic and pedestrian-congested area which is also a transfer point for a number of rapid transit lines. Respondent Commissioner denied the application June 22, 1960, without offering Rockwell an alternative time or place. This proceeding under article 78 of the Civil Practice Act was instituted August 11, 1960 to review the Commissioner's determination.

Special Term dismissed the petition. The nub of its reasoning was that Rockwell had by speech and pamphlet accused more than two and a half million residents of New York City of being traitors, identified by their ethnic and religious classification; that he was a " self-confessed advocate of violence " and Hitlerian methods; and that if he spoke it was " inevitable that public disorder and riot will result ".

Rockwell has appealed urging that the Commissioner did not comply with the very regulation under which he purported to act, and that, if he had such power under the regulation, it is void for unconstitutionality. Respondent Commissioner contends that under the regulation he has the power, constitutionally, to refuse a permit to one whose activities would create serious disorder — a clear and present danger. Respondent also urges that the date requested, July 4, 1960, having passed, the matter has been rendered moot, and the petition should be dismissed.

The order of Special Term must be reversed and the petition granted in part. The Commissioner did not comply with his own regulation. In any event, such a power, as arrogated by the Commissioner, would be unconstitutional. Because the regulation requires provision of an alternative time and place, and the issue is of such vital constitutional significance, the proceeding has not been rendered moot.

First: The record does not support the grounds subsequently assigned by the Commissioner for his action.

At or about the time Rockwell made his application for a permit the metropolitan newspapers were filled with material about him, all to his evident satisfaction and purpose. His activities in his favorite haunt, Washington, D. C., near his home in Virginia, were publicized, including his arrest for creating public disorder by highly offensive, rabid, racist speeches. As a result, several organized groups in this city were aroused, the Mayor made public pronouncements, and the Commissioner in due course denied Rockwell's application, without at that time assigning any reasons. In fact, all the Commissioner had before him, and that is still the only original administrative record, is a stark application, which, except for the designation " American Nazi Party ", and a reference to " Storm Leader ", suggests none of the things for which Rockwell stands or may be responsible.*

Later, in the judicial proceeding the Corporation Counsel endeavored to supplement the bare administrative record by annexing newspaper cuttings and leaflets distributed, purport-

---

* A copy of the application is attached as Appendix A.

edly, by Rockwell and his group. These reveal or represent the characteristic emissions of certain extremist, often paranoid, groups, not large in number, but often responsible for disorder in sensitive places in the Nation. Characteristically too, equivocal language is used suggesting dire acts of violence and destruction but not quite related to any immediacy in time. Group hate and fear are stimulated and expressly intended to be stimulated in those ripe for it. Whether the authors intend to attain their ends by unlawful or lawful means is not made clear, and undoubtedly purposely so. In this case the evidentiary relevance for these additions is never quite established. Not only were they not before the Commissioner, but no proper authenticating foundation was laid.

While it is true that petitioner has not replied to the answer interposed in the judicial proceeding, that is of no moment. In the first place, respondent makes no point of it. Moreover, the answer, since it annexes, as required by the statute, the evidentiary material in support of the affirmative allegations, establishes internally the insufficiency in law of the affirmative defenses. Consequently, petitioner is not procedurally disadvantaged by his failure to serve a reply to the conclusory allegations or to evidentiary matter that fails to support the conclusions (22 Carmody-Wait, New York Practice, pp. 475, 479–480). Where a point of law is involved with respect to the answer petitioner may but is not bound to serve a reply; he may elect to raise the issue by oral motion on the return date (Civ. Prac. Act, § 1293).

It is in the very spirit and purpose of proceedings under article 78 to provide a summary remedy, so summary, indeed, as to dispense with the need or occasion for the application of summary judgment under rule 113 of the Rules of Civil Practice (Civ. Prac. Act, §§ 1291, 1292, 1293; *Matter of Ackerman* v. *Kern,* 256 App. Div. 626, 630, affd. 281 N. Y. 87; Third Annual Report of N. Y. Judicial Council [1937] pp. 185–187; 22 Carmody-Wait, New York Practice, *supra,* pp. 475, 479–480; Tripp, A Guide to Motion Practice [rev. ed.], p. 283; cf. *Matter of Clark* v. *Allen,* 7 A D 2d 144, 146, motion for leave to appeal denied 6 N Y 2d 707; *Matter of O'Brien* v. *Commissioner of Educ.,* 3 A D 2d 321, 325–326, appeal dismissed 4 N Y 2d 140, appeal dismissed, cert. denied *sub nom. Murphy* v. *Commissioner of Educ.,* 361 U. S. 117). Above all, to decide this important matter on so technical a procedural point not raised, and therefore waived, would hardly be helpful to the authorities in meeting their responsibilities. And the question would come up again soon enough (see, *infra,* Fifth). But, in the light of the provisions of section 1296, and

the nature of the answer and supporting affidavits, petitioner did not omit any procedural steps.

Consequently, there is no competent record upon which the Commissioner, Special Term, or this court, could reach the conclusion, even if otherwise legally permissible, that Rockwell's proposed speech on July 4, 1960 was likely to create the disorders, upon the basis of which his application was denied.

Second: The Commissioner did not follow the regulation of his own department.

The Commissioner acted under section 21-a of the Rules of the Department of Parks.* It provides express standards. These bar all private or commercial uses. In addition, the rule bars various uses affecting adversely the physical facilities in the park, or the priorities of convenience. No standards are provided or suggested related to speech content. The rule mandates that, whenever a permit is denied for any but commercial or private uses, alternative suitable location and date must be offered to the applicant. This last the Commissioner did not do.

The regulation is one carefully and consciously drawn in the light of recent judicial constitutional pronouncements (*People* v. *Nahman,* 298 N. Y. 95; *Saia* v. *New York,* 334 U. S. 558; *Cox* v. *New Hampshire,* 312 U. S. 569). Thus, the regulation depends for validity upon the fact that it does not authorize censorship of speech content, condemned in the *Saia* case. There, in striking down a municipal ordinance adopted in this State, Mr. Justice Douglass said on behalf of the court: "The present ordinance has the same defects [as in *Cantwell* v. *Connecticut,* 310 U. S. 296, *infra*; and *Hague* v. *C. I. O.,* 307 U. S. 496, *infra*]. The right to be heard is placed in the uncontrolled discretion of the Chief of Police. He stands athwart the channels of communication as an obstruction which can be removed only after criminal trial and conviction and lengthy appeal. A more effective previous restraint is difficult to imagine" (pp. 560–561).

Notably, in the *Nahman* case, a prosecution for displaying placards without a permit and involving section 21 (not § 21-a) of the Park Department Regulations, the then Commissioner represented to the court as follows: "Meetings and other public events are never prohibited through the permit procedure but are merely scheduled and located as to area and time in an orderly way by making necessary adjustments in the place and time stated in the application for a permit where such adjustment is necessary in the interest of the comfort, convenience and protection of the general public in the use of the parks. The

---

* The full text of section 21-a is set forth as Appendix B. Because of relevance later, section 21 is also set forth in the same appendix.

application procedure is used so as to limit the use of available areas to one group at a time and provide for proper police and other supervision where necessary so that meetings and other events will be orderly and without danger to the safety of others using the parks '' (p. 102).

Thereafter, section 21-a was adopted.* From its terms it appears to be a codification of the practice under section 21 then described by the commission. It follows the strictures of the court that in the regulations '' No power to suppress the publication of facts or opinions is thereby conferred and the sole standard of official action thereby countenanced is the promotion of beauty and utility of the public parks of the city — an objective which undoubtedly goes far to secure the safety, comfort and convenience of a population of more than eight million people '' (pp. 101–102).**

Moreover, whatever doubt may have remained as to the right to speak in public parks without prior restraint was eventually made clear in *Niemotko* v. *Maryland* (340 U. S. 268), thus justifying the narrow and cautious handling of the permit procedure by the Park Department in the *Nahman* case (*supra*) and in the later draftsmanship of section 21-a. There it was held that a park commissioner could not withhold a permit to Jehovah's Witnesses to speak, by reason of a municipal custom in which there were no limited standards confined to proper physical use of a park, and that, therefore, the permit was refused because of dislike for Jehovah's Witnesses. A conviction for speaking without a permit was vacated . There is little to distinguish that case from this except that some may resent '' American Nazis '' more than Jehovah's Witnesses.

Consequently, there is no doubt that the Commissioner arrogated a power he did not have under the very regulation of his own department. On this view the regulation is valid under well-recognized constitutional principles, but the Commissioner's action is vulnerable.

Third: Regulations aside, there is no power in government under our Constitution to exercise prior restraint of the expression of views, unless it is demonstrable on a record that such

---

* Section 21 was also amended and the amendments are quite significant. Section 21, both in the form in which it was at the time of the *Nahman* case and as it reads today, appears in Appendix B.

** *People* v. *Hass* (299 N. Y. 190; app. dsmd. 338 U. S. 803) held no differently. The *Hass* case involved erecting a stand in the streets and speaking without a permit, not the refusal of a permit. The regulation was sustained because it was not discriminatory of speech content but was solely designed to protect public convenience.

expression will immediately and irreparably create injury to the public weal—not that such expression, without itself being unlawful, will incite criminal acts in others.

The cases in support of this teaching are many. It is enough to refer to those in which the facts come quite close to those at hand (if a proper record could have and had been made).

In *Near* v. *Minnesota* (283 U. S. 697) there was involved a statute authorizing injunction to restrain publication of malicious, scandalous, and defamatory matter. The State courts enjoined defendant from publishing a periodical which, in undisguised language, charged an ethnic group with gangster control of Minneapolis. Capitalization of words, epithets, references to violence and death were interspersed not only to be offensive but to be stimulative of group hate and fear. It was quite equal, in impact, to much of the literature attributed to Rockwell. The statute was struck down as an unconstitutional prior restraint on expression of views.

Much closer in time and much closer to home is *Kunz* v. *New York* (340 U. S. 290). In that case, Kunz, a self-styled religious preacher, used Columbus Circle in congested mid-Manhattan in New York City, to denounce in vicious and unbridled terms, Jews and Catholics. He too spoke of the incinerators of Hitler Germany, and regretted that the job was not complete. He had no permit as required by local ordinance, and was convicted for that violation. He was not prosecuted for any violation of law based on speech content. The Supreme Court struck the ordinance down as invalid previous restraint.

The court (p. 293) quoted from *Hague* v. *C. I. O.* (307 U. S. 496, 515, *supra*) with approval: " ' Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' "

It went on to say on its own (per VINSON, Ch. J.): "The court below has mistakenly derived support for its conclusion from the evidence produced at the trial that appellant's religious meetings had, in the past, caused some disorder. There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence * * * We are concerned with suppression—not punishment" (pp. 294–295).

It makes no difference that the *Kunz* case involved religious freedom. Indeed, it has been said neatly that there is an absolute right to religious belief, but that the right to religious speech or

activity may be qualified, albeit only to a very limited degree (*Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304).* Thus, for this purpose, the right of expression in religion or politics is about the same. Either right is equally qualified, just the same as the right to religious or political *belief* is equally absolute. But even the qualified right to speak on religion or politics is not subject to prior restraint with but the narrowest of exceptions.

The narrowest of exceptions relate to immediate and irreparable injury to the public weal (e.g., *Schenck* v. *United States,* 249 U. S. 47, involving anti-conscription activity in time of war; but compare *De Jonge* v. *Oregon,* 299 U. S. 353, in which it was held that participation in a "lawful" meeting of a subversive organization could not be made the subject of criminal prosecution). But this does not justify the perversion that if the actor's speech, otherwise innocent, incites others to unlawful action he may be suppressed (*Terminiello* v. *Chicago,* 337 U. S. 1).

In the *Terminiello* case, a racist, rabid, suspended clergyman, spoke in a private hall. His speech would satisfy the generic definition in which the Kunz and Rockwell emissions fall. A crowd outside threw missiles, fights started, and doors were broken. The situation inside the hall was only a little better. It was no trivial affair.** Terminiello's conviction, *postfactum,* was vacated because the charge to the jury was broad enough to encompass a finding of guilt, even if the defendant had said nothing unlawful. Said the court (per DOUGLAS, J.): "It [the charge] permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest" (p. 5).

Even the dissenters (VINSON, Ch. J., and FRANKFURTER, BURTON and JACKSON, JJ.) in the *Terminiello* case did not seem to dispute that the measure of the speaker is not the conduct of his audience.

---

* Further, it was said (Per ROBERTS, J.) : "No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment" (p. 304).

** The detailed description is to be found in the dissenting opinion of Mr. Justice JACKSON (pp. 13–23).

In the *Kunz* case (*supra*) Mr. Justice JACKSON, in an eloquent dissenting opinion, made the most of the position now taken by respondent in favor of previous restraint. It did not prevail then, and has not since. This is not because the speeches of Kunz were any more tolerable than those of Rockwell. The problem is much deeper and more difficult.

Fourth: While there may not be a prior restraint on the expression of views, but for the narrowest of exceptions, there may be complete responsibility for the content of such expression.

Again, the cases are many. It is on such cases that respondent largely and mistakenly relies. They involve subsequent punishment for what was said, which expression unlawfully injured others or the public weal (*Beauharnais* v. *Illinois*, 343 U. S. 250*; *Chaplinsky* v. *New Hampshire*, 315 U. S. 568; *Whitney* v. *California*, 274 U. S. 357; *Gitlow* v. *New York*, 268 U. S. 652; *People* v. *McWilliams*, 22 N. Y. S. 2d 571 [Magistrates' Ct.], revd. on other grounds 31 N. Y. S. 2d 37; *People* v. *Doss*, 384 Ill. 400).

Once again, there is precedent closer in time and closer to home. In *Feiner* v. *New York* (340 U. S. 315) the speaker was convicted of disorderly conduct when he refused to stop his provocative speaking as riot impended, although requested by police officers. (Perhaps it is of controlling significance that Feiner was inciting a "mob" to disorderly action in favor of his teaching; a "mob" was not reacting unlawfully to his speech, although adverse action was threatened by one or more individuals.) The conviction was sustained in the State courts, and in the Supreme Court. In the last court it was said (per VINSON, Ch. J.) : "We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker, and are also mindful of the possible danger of giving overzealous police officials complete discretion to break up otherwise lawful public meetings. * * * But we are not faced here with such a situation. It is one thing to say that the police cannot be used as an instrument for the suppression

---

* Consider the moving language, appropriate here, of FRANKFURTER, J., for the majority: "Illinois did not have to look beyond her own borders or await the tragic experience of the last three decades to conclude that wilful purveyors of falsehood concerning racial and religious groups promote strife and tend powerfully to obstruct the manifold adjustments required for free, ordered life in a metropolitan, polyglot community" (pp. 258–259).

But the remedy was *postfactum* punishment for the deed done. There was punishment for unprivileged expression, not previous restraint.

of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace '' (pp. 320–321).

Now, there is no question that government, in each of its branches — executive, legislative and judicial — faces here one of its gravest domestic problems. Although marked advances in thinking and solution have occurred, total resolution has not yet been achieved. To some, the cases may seem to have zig-zagged since the days of *Davis* v. *Massachusetts* (167 U. S. 43, in which, incidentally, it was the opinion of Mr. Justice HOLMES, written with a much finer pen, in the Supreme Judicial Court of Massachusetts that was upheld [162 Mass. 510]) when it seemed, and it was said, that the municipality had absolute control of its streets and parks, even to the arbitrary exclusion of a speaker from Boston Common. Actually, a consistently forward-moving pattern emerges, and that pattern serves thus far to balance protection for the speaker and for the public.*

A community need not wait to be subverted by street riots and storm troopers; but, also, it cannot, by its policemen or commissioners, suppress a speaker, in prior restraint, on the basis of news reports, hysteria, or inference that what he did yesterday, he will do today. Thus, too, if the speaker incites others to immediate unlawful action he may be punished — in a proper case, stopped when disorder actually impends; but this is not to be confused with unlawful action from others who seek unlawfully to suppress or punish the speaker.

---

* For an exceptionally thoughtful analysis, see Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533 (1951). See, also, McKay, The Preference for Freedom, 34 N. Y. U. L. Rev. 1182, but esp. at 1215 (1959); cf. Note: Prior Restraint, 49 Col. L. Rev. 1001 (1949).

For a philosophical evaluation see Cahn, Firstness of the First Amendment, 65 Yale L. J. 464 (1956).

For two thoughtful and quite useful notes in analyzing the relations between innocent speaker v. lawless audience, guilty speaker v. lawless audience, and guilty speaker v. law-abiding audience, together with responsibility for foreseeable reaction in the audience, see:

Note: Problem of The Hostile Audience, 49 Col. L. Rev. 1118–1124 (1949);

Note: Free Speech and The Hostile Audience, 26 N. Y. U. L. Rev. 489–505 (1951).

The first note was written before the trilogy of the *Kunz, Niemotko,* and *Feiner* cases (*supra*), while the second note was written thereafter. With respect to the latter, one hardly may agree with the interpretation, qualified though it is, of the *Feiner* case.

So, the unpopularity of views, their shocking quality, their obnoxiousness, and even their alarming impact is not enough. Otherwise, the preacher of any strange doctrine could be stopped; the anti-racist himself could be suppressed, if he undertakes to speak in " restricted " areas; and one who asks that public schools be open indiscriminately to all ethnic groups could be lawfully suppressed, if only he choose to speak where persuasion is needed most.

It is worth noting that Mr. Justice FRANKFURTER, in his concurring opinion in *Niemotko* v. *Maryland* (340 U. S. 268, 273 *et seq., supra*), which also covers his views in the *Kunz* and *Feiner* cases (*supra*), stated a suggestive proposition with which one may agree. It is to the effect that municipalities or States can legislate effectively to prevent the mad, the criminal, or the subversive from taking over the streets, and this can be done in accordance with the requirements of the Fourteenth Amendment, but that it is not for the courts to tell them how (pp. 284–285).

Quite interesting in that connection is *Poulos* v. *New Hampshire* (345 U. S. 395), involving a park permit procedure, the same as that involved and sustained in the *Cox* case (*supra*). Substantially, the analyses here and in that case are in accord. Much more important is that the case has maximum significance for those who would legislate in this area. For, in the *Poulos* case, a conviction for speaking without a permit was sustained although the permit was arbitrarily refused, because, it was held, defendant should have exhausted his judicial remedies to review the administrator's action. Of course, and emphatically, the case may not be misread to permit advance censorship of speech content, even in these circumstances.

Notably, when section 21-a itself was drawn, it was done with recent teachings in mind. But now, once again, against a speaker despised, hated, or feared, the lawless short-circuit is seized upon. The evil to be ended provokes evil means to that end. This is not good law or good morals. No doubt, too, suppression is easier than punishment. No doubt suppressing a minority is easier than keeping a misbehaving majority in line. But that is exactly the purpose of law, and of government under law. Indeed, the moral imperative is for all to obey the law, the audience as well as the speaker, and especially those who do not wish to be even a part of the audience.

Only if Rockwell speaks criminally (or, perhaps, if it is established on a proper record, in that very rare case, that he will speak criminally, not because he once did, but that he will this time, and irreparable harm will ensue) can his right to speak

be cut off: If he does not speak criminally, then, of course, his right to speak may not be cut off, no matter how offensive his speech may be to others. Instead, his right, and that of those who wish to listen to him, must be protected, no matter how unpleasant the assignment.

Fifth: Because of the important public issue involved and the future significance of the constitutional questions raised, and also because the Commissioner failed to provide petitioner with an alternative time and place for his speech, the proceeding has not been rendered moot.

On public significance justifying retention of jurisdiction see: *Matter of Rosenbluth* v. *Finkelstein* (300 N. Y. 402, 404) and *Matter of Adirondack League Club* v. *Black Riv. Regulating Dist.* (301 N. Y. 219, 222). In any event, the matter is not moot because under the park regulation petitioner would be entitled to an alternative time and place, if the Commissioner should find that Union Square Park was unsuitable as to either or both (§ 21-a, *supra*). In other words, the date requested in the application is not determinative of the matter.

In summary, the key to understanding is really very simple: The right of free expression is not to be entrusted to administrative previous restraint for contemplated violation of law, but such expression is not immune from punishment after the fact for what has been said, by judicial process. This is not unreasonable. History elsewhere has shown the executive sometimes to establish tyranny and dictatorship by the powers of suppression.

Surely, there is risk in denying prior restraint. It is a price paid for liberty while order is to be preserved by the sanction of punishment after the fact. It is the price paid for not having the policeman or the Commissioner as censor, while leaving the courts, disciplined by appellate review and the rules of evidence, to provide punishment under criminal standards for the unlawful act already committed.

But the risk is not so great as to be intolerable in a civilized, law-abiding community. Indeed, recent events, when especially provocative personalities attended an international meeting in this city, prove otherwise. Then these personalities did not represent mere mad ravings but effective, and not too remote, threats of widespread death and destruction. Nevertheless, the people, at least the residents, in this community, to many of whom these personalities were directly offensive and repugnant, did not resort to riot. They knew what was expected of them. It had also been made quite clear to them that the law was to be

enforced without discrimination. The reward was not only the order which obtained, but the national respect that ensued for the people and their police force.

Of course, recent events, elsewhere, have shown that riotous conditions can be produced or will occur, merely by law enforcement agencies declaring their inability to prevent riot, and asking, even in courts of law, for the right to be denied so that riot will not occur. (*Cooper* v. *Aaron,* 358 U. S. 1, and also the opinion below, *sub nom. Aaron* v. *Cooper,* 257 F. 2d 33, esp. 39, involving the Arkansas school integration case of recent memory.)*

It is not law or order that is fashioned to avoid riot at the expense of compromising constitutional guarantees. Instead, it is something which can end only in anarchy and then tyranny.

On argument, the intervenor conceded that, except as an organized group in the public generally, it had no legal interest in this litigation. Consequently, it was improvidently made a party, and the court on its own motion should strike intervenor as a party to the proceeding and its name from the title thereof.

For the reasons given at Special Term the ex parte order issued in Kings County may be ignored. Moreover, it bears on its face the void exercise of unconstitutional power.

Provision should be made for the filing of a new application by petitioner, if he wishes, since the date requested by him has long since passed.

Accordingly, the order of Special Term dismissing the petition should be reversed, on the law, without costs, and the petition should be granted to the extent of remanding the matter to the Commissioner for the purpose of allowing petitioner to file a new application for a permit and for the Commissioner to proceed thereon in accordance with this opinion; and this court on its own motion should strike from the proceeding the intervenor as a party and strike from the title its name and designation as such party.

---

* In the Court of Appeals it was said: " The precise question at issue herein, i.e., whether a plan of integration, once in operation, may lawfully be suspended because of popular opposition thereto, as manifested in overt acts of violence, has not received judicial consideration." (257 F. 2d 33, 37.)

In the Supreme Court it was said: " The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature." (358 U. S. 1, 16.)

APPENDIX A
DEPARTMENT OF PARKS
CITY OF NEW YORK
BOROUGH OF MANHATTAN

Application for Permit to Hold a Speech
Application Number
Date May 17, 1960
Speech on July 4, 1960

To the Commissioner of Parks:

I George Lincoln Rockwell, Telephone No. JAckson 4-5831 residing at 928 North Randolph Street, Arlington, Virginia, holding the office of Commander in the American Nazi Party hereby apply in the name of that organization for a permit to hold a SPEECH in UNION SQUARE at (illegible) from three P.M. to five P.M. on July 4 (fourth), 1960.

1. Character of organization    Political
2. Is organization incorporated?    No?    Where?    When?
Total membership    57
3. Number who will take part in event.  Active Participants    approx. 12
Spectators    approx. 30–40
4. Give name and address of each officer who will participate in the event:

| Name | Office | Tel. No. | Address |
|------|--------|----------|---------|
| Lincoln Rockwell | Commander | JA-4-5831 | 928 N. Randolph Arlington, Va. |
| J. V. K. Morgan | Deputy Commander | " | 298 Chinquapin Vil, Alexandria, Va. |
| Louis Yalacki | Lieutenant | " | Same as Rockwell (above) |
| George Harriss | Storm Leader | " | Same as Rockwell (above) |

5. Purpose of Event    Exercise constitutional right of free speech on political opinions.
6. a. Will there be a parade?    No    Time    Will there be a band? No.    (record)    Time
   b. Will there be speeches?    Time
   c. Supervision to be provided by organization    8 ushers.
   d. Will buses be required for transportation?    No.    How many?
   e. Will trucks be required for deliveries?    No.    How many?
   f. Other pertinent information    All hands will arrive and depart the area in private vehicles.
7. State previous events held in parks by the organization?  Event SPEECHES Location The Mall (9th & Const.) Washington, D. C.  Date every Sun. since 3 April
8. Name, address and telephone number of chairman Lincoln Rockwell, address and phone above.

LINCOLN ROCKWELL

Approved
Disapproved

Approved
Disapproved

A self-addressed Stamped Envelope Must Be Submitted with This Application to the Borough Office.

## APPENDIX B
## RULES AND REGULATIONS OF NEW YORK CITY AGENCIES
## CHAPTER 15
## DEPARTMENT OF PARKS
### Article III

Section 21. Exhibitions, Parades, Racing, etc.

1. No person shall erect any structure, stand or platform; exhibit any dramatic performance, or the performance in whole or in part of any interlude, tragedy, comedy, opera, ballet, play, farce, minstrelsy, dancing, entertainment, motion picture, public fair circus, juggling, rope-walking, or any other acrobatics, or show of any kind or nature; or parade, drill or maneuver of any kind; or run or race any horse, or other animal or being in or on a vehicle, race with another vehicle or horse whether such race be founded on any stake, bet or otherwise; or hold any athletic contest; in any park or upon any park-street except by permit.

2. The Commissioner may in his discretion issue such permit upon application when he deems it consistent with the proper use and protection of the park property under his jurisdiction.

Section 21-a. Meetings, etc.

1. No person shall erect any structure, stand or platform, hold any meeting, perform any ceremony, make a speech, address or oration; exhibit or distribute any sign, placard, notice, declaration or appeal of any kind or description; in any park or upon any park-street except by permit.

2. Upon application such permit will be issued unless — (a) The use for which the permit is sought is of a private or commercial nature or (b) The location selected is not suitable because the area is specially landscaped and planted with botanical, flower, shrub or tree exhibits or (c) The location selected is not suitable because it is one of the specialized park use areas such as zoos, skating rinks, swimming pools, recreational, etc. or, (d) The date and time requested has previously been allocated by permit, or would obstruct and interfere substantially with park use and enjoyment by the public.

3. Whenever a permit is denied by reason of (b), (c) or (d) above, alternative suitable locations and dates shall be offered to the applicant.

Section 21, as it read at the time that *People* v. *Nahman* (298 N. Y. 95, *supra*), was decided, provided as follows:

*"Meetings, Exhibitions, Parades, Racing, etc.* No person shall erect any structures, stand or platform, hold any meeting, perform any ceremony, make a speech, address or harangue; exhibit or distribute any sign, placard, notice, declaration or appeal of any kind or description; exhibit any dramatic performance, or the performance in whole or in part of any interlude, tragedy, comedy, opera, ballet, play, farce, minstrelsy, dancing, entertainment, motion picture, public fair, circus, juggling, rope-walking, or any other acrobatics, or show of any kind or nature; or run or race any horse, or other animal, or, being in or on a vehicle, race with another vehicle or horse, whether such race be founded on any stake, bet or otherwise; in any park or upon any park street except by permit. No parade, drill or manoeuver of any kind shall be conducted, nor shall procession form for parade or proceed in any park or park street without a permit" (pp. 100–101).

The deletion of references to meetings and to various processions, in the light of the cases, is markedly significant.

EAGER, J. (dissenting). The order appealed from should be affirmed and the petition dismissed. The petitioner does not show a clear legal right to any relief herein; and, in any event, this court, in the exercise of discretion, should deny relief to the petitioner.

The petition herein alleges an application to the Commissioner of Parks of the City of New York for a permit to hold a speech on behalf of the "American Nazi Party" in a certain park, at a specified time on a certain date, to wit, "for a permit to hold a SPEECH in UNION SQUARE * * * from three P.M. to five P.M. on July 4 (fourth), 1960". The petition further sets forth that the application for the permit was denied by the respondent Commissioner without the statement by him of any reason for such denial, and that, in denying said application, the respondent did not offer the petitioner alternative suitable locations and dates. It is thereupon alleged that the denial of the permit constitutes the exercise by the respondent of a prior restraint and censorship of the proposed speech of the petitioner and unlawfully discriminates against him, all in violation of the Constitution of the United States and of the Constitution of the State of New York. Petitioner thereupon prays for an order "directing and compelling" the issuance of a permit for a public speech in "Union Square Park".

The answer of the respondent Commissioner denies the material allegations of the petition other than the allegations of the making of the application by the petitioner for the permit to make a speech on behalf of the American Nazi party and the denial thereof without the offering of other locations and dates. In addition, the answer affirmatively alleges, among other things, "That the American Nazi Party is a subversive organization advocating the overthrow of the constitutional government of the United States by force and violence in violation of Sec. 160 et seq. of the Penal Law"; that "the purpose of the proposed meeting for which petitioner sought a permit was to advocate the aims and purposes of the American Nazi Party"; that "one of the aims and purposes of said American Nazi Party is the perpetration of racial genocide upon persons of Jewish ancestry by extermination in gas chambers"; that "the use of public property owned by a political subdivision of a state to urge racial genocide is contrary to law"; that "the aims and principles of the American Nazi Party in whose behalf the petitioner sought to conduct a public meeting are such as to have the natural and consequential effect of inciting an ordinary prudent person to acts of violence and disorder"; that the Police Department, while it "is capable of quelling the riot

and disorder that would flow from the advocacy of the aims and purposes of the American Nazi Party by the petitioner and his followers, * * * is powerless to prevent such riot or disorder from occurring in the first instance.''

The allegations of the answer of the respondent are buttressed by affidavits indicating that Rockwell would use the permit to hold a meeting in this park of his followers to make a highly abusive and provocative speech, which would, without doubt, tend to create riot, disorder and a breach of the peace. The Commissioner of Parks in his affidavit alleges that the denial by him of the permit '' was predicated upon the determination by me and the Mayor of the City of New York that such a meeting could not be held by the petitioner and his followers without resultant disorder, riot and violence endangering city property and the safety and welfare of the residents of the City. * * * His past course of conduct clearly justifies the conclusion that he is deliberately intent on provoking his listeners, friendly or otherwise, to acts of violence * * *. It is inevitable that should the petitioner seek to pursue his purpose of ' A discussion of the political opinions of said organization ' * * * as in the past, riot and disorder will follow. * * * A reading of the documentations of the petitioner and his fellow hate-mongers can leave no doubt that given a public forum he would pursue his established pattern of reiterating his evil principles to the degree that no decent person within his hearing could refrain from taking some overt steps to halt his vicious attack.''

Hon. Robert F. Wagner, the Mayor of the city, in his affidavit, calls attention to the fact that '' General Municipal Law, Section 71, imposes liability upon a city to a private person whose property is destroyed or injured therein by a mob or riot '', and notes that '' this section imposes personal liability upon the Mayor, if, after notification of a threat or attempt to destroy or injure property by a mob or riot, he neglects or refuses to take all lawful means to protect said property.'' He then avers that his '' decision and that of Commissioner Morris to deny petitioner's application was not predicated upon personal abhorrence for the philosophies expressed by the individual * * * [but] was made by me as Chief Executive Officer and by Commissioner Morris in fulfillment of our obligations as placed upon us by law, based upon information furnished from qualified sources which established that petitioner's philosophy is not one of mere political expression but is one espousing the spread of hate, dissension, fear and discord and more important, the advocacy of the extermination and annihilation of a segment

of our New York citizens because of their religious background. * * * The overwhelming factual evidence irresistibly supported the conclusion that petitioner's persistent course of inflammatory conduct would inevitably lead, as it has in the past, to the use of language and acts calculated to incite normal and reasonable persons to acts of violence." Further that " The petitioner has never disclaimed any intent to make pronouncements of the nature herein described. In fact, his frankness in public statements leaves no doubt as to his purposes and motives in seeking the permit. Under these circumstances, the situation requires me to exercise the powers vested in me by the Charter to protect the residents of the City of New York against riots, disorder and acts of violence."

True, the quoted allegations from the affidavits are principally conclusory in nature, but, in my opinion, they are amply supported by factual detail in the record not denied by the petitioner.

The petitioner Rockwell was by law given an opportunity herein to present an issue and to be heard thereon. His failure to deny the affirmative matter set up in the answer of the Commissioner is not only most persuasively indicative of his unlawful intentions but has legal significance which is not to be overlooked. If the petitioner desired to dispute the allegations of the answer, he was bound to serve a reply. He has not served a reply nor replying affidavits. Therefore, the affirmative matter alleged by the Commissioner in his answer is to be deemed admitted to be true. (Civ. Prac. Act, § 1292; *Matter of De Marco* v. *Fitzgerald,* 10 A D 2d 887; *Matter of Marshall* v. *O'Connell,* 285 App. Div. 855.)

It is true that the respondent makes no specific point of the failure of the petitioner to reply to the answer and to the proofs submitted by respondent. This, however, is immaterial and constitutes no waiver of the right of the respondent to have a determination upon the record before the court. The failure of the petitioner to reply virtually results here in an undisputed record and permits the court to finally dispose of the proceeding in accordance with the law.

Under the circumstances, we know in substance what the petitioner Rockwell will say and seek to accomplish. We have an undisputed record indicating that he would use the sought for permit to make a highly offensive and very provocative speech insulting generally the good citizens of the city and country of particular races or origin. It appears that he will thereby incite and create criminal acts, or, in any event, bring about such a disorderly demonstration as to interfere with the

public comfort and safety in this particularly congested area in New York City. Therefore, the action of the respondent Commissioner of Parks in his flat denial of the petitioner's application may and should be sustained.

It is to be noted that the position of the petitioner was then and now is that he was and is entitled as a matter of absolute right to a permit to make a speech in Union Square Park in the City of New York. The learned Justice at Special Term (26 Misc 2d 229, 230) so considered the petitioner's application, for he said: "Petitioner here insists upon the 'right' to speak in Union Square, a small place in the heart of New York City's crowded business and residence area, and he demands an unrestricted permit, subject only to police and criminal legal action there and then, to speak his piece. Counsel for petitioner went so far, in answer to this court's inquiry, to state that a 'madman' was entitled to the issuance of such a permit and no limitations or conditions can be fixed by the respondent Commissioner on the issuance of such license."

Certainly, the petitioner Rockwell may not be upheld in a position that he is beyond control of law and that he may speak what, when and where he pleases without limitation. Neither constitutional mandate nor other law gave him the absolute right to speak in Union Square Park on the Fourth of July, or, for that matter, on any other day. A reading of the decisions would indicate that a municipality, by reasonable regulation, may control the making of speeches in streets and parks, providing such regulation is directed to the protection of public peace and of the primary uses of travel and recreation for which streets and parks exist. (Decisions are referred to *infra*.) Some latitude for honest judgment may be left to the local officers. Condemned only is the vesting in administrative officials or in the court, for that matter, of the discretion to grant or withhold a permit to speak in a public street or park upon broad criteria unrelated to proper regulation of public places. (See *Kunz* v. *New York*, 340 U. S. 290, 294.)

It was proper, therefore, that a measure of discretion be vested with the Commissioner of Parks in connection with issuance of permits for park use; and the applicable laws and regulations indicate that he does have some discretion. By virtue of section 532 of the City Charter, the Park Commissioner was charged with the "care of all parks, parkways, squares and public places". The Rules and Regulations of the Department of Parks provide that "No person shall * * * hold any meeting * * * make a speech, address or oration * * * in any parks or upon any park-street except by permit." It is

further provided that the permit shall be issued unless, among other things, the " date and time requested * * * would obstruct and interfere substantially with park use and enjoyment by the public ", and in such case it is provided that " alternative suitable locations and dates shall be offered to the applicant ".

By virtue of the aforesaid laws and regulations, there is expressly conferred upon the Park Commissioner the power to refuse to issue a permit to use a particular park on a particular day where he is of the opinion that the granting of the same " would obstruct and interfere substantially with park use and enjoyment by the public." Thus, it is clear that the respondent Commissioner was possessed of a measure of discretion in the premises. (See *People ex rel. Schwab* v. *Grant*, 126 N. Y. 473, 481; *People ex rel. Doyle* v. *Atwell*, 232 N. Y. 96; *Matter of Dr. Bloom Dentist* v. *Cruise*, 259 N. Y. 358; *Matter of Barton Trucking Corp.* v. *O'Connell*, 7 N Y 2d 299, 307.) And, under the settled rule, applicable when discretionary administrative action is questioned, the Commissioner's denial of petitioner's application for the permit is not to be interfered with by the courts unless established to be unlawful, arbitrary or capricious. (See *Matter of Larkin Co.* v. *Schwab*, 242 N. Y. 330; *Matter of Barton Trucking Corp.* v. *O'Connell, supra.*)

Where, as here, there were reasonable bases for the Commissioner's conclusion that the use of Union Square Park by the petitioner would result in " disorder, riot and violence endangering city property and the safety and welfare of the residents of the City ", his determination to refuse the permit was within the limits of the discretion conferred upon him. (See *People* v. *Nahman*, 298 N. Y. 95, 102, 103.) Such determination was in keeping of law and order rather than unlawful or arbitrary. It was well grounded rather than capricious.

The Commissioner had the power to deny the petitioner's permit application, and his mere failure to proceed further and offer the petitioner " alternative suitable locations and dates ", as required by the Park Rules and Regulations is not in issue here. The petitioner, as noted above, took the position in his application to the Commissioner and in the court below that he had the absolute right to speak in Union Square Park. It is clear that such is his position on this appeal. As will be hereinafter pointed out, the petitioner has no such right.

The failure to allow petitioner to speak in a park was not unlawful for the reason, as contended for by the petitioner, that it was in contravention of his constitutional rights. The guarantee of the First and Fourteenth Amendments to the United States Constitution of free speech to the individual is not

absolute. (*Times Film Corp.* v. *City of Chicago,* 365 U. S. 43.) "Liberty of speech, and of the press, is also not an absolute right". (*Near* v. *Minnesota,* 283 U. S. 697, 708; *Kingsley Books* v. *Brown,* 354 U. S. 436.) "The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. It is a *non sequitur* to say First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary." (*Poulos* v. *New Hampshire,* 345 U. S. 395, 405.)

The right to conduct a meeting in a street or public park for expression of one's opinions is not guaranteed by the Constitution. The decision in *Hague* v. *C. I. O.* (307 U. S. 496), while strongly advocating the preservation of civil liberties generally, nevertheless held that the right to speak in the street or a public park was not unlimited. Mr. Justice ROBERTS said (pp. 515–516): "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

The petitioner, pointing to this decision (*Hague* case, *supra*) and other decisions (see, also, *Niemotko* v. *Maryland,* 340 U. S. 268) argues that any and all prior restraint upon speaking in a public park is unlawful as frustrating the constitutional guarantees. It is clear, however, that the constitutional "protection even as to previous restraints is not absolutely unlimited". (*Near* v. *Minnesota, supra,* p. 716; *Kingsley Books* v. *Brown, supra,* p. 441; also *Times Film Corp.* v. *City of Chicago, supra.*) Mr. Justice STORY defined the pertinent constitutional phrase to mean "that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure

any other person in his rights, person, property, or reputation; and so always that he does not thereby disturb the public peace, or attempt to subvert the government.'' (2 Story, Commentaries on the Constitution [5th ed.], § 1880, formerly § 1874. [Quoted in *People* v. *Most,* 171 N. Y. 423, 431.]) '' There are certain well-defined and narrowly limited classes of speech, the *prevention* and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and the obscene, the profane, the libelous, and the *insulting or ' fighting ' words* — those which by their very utterance inflict injury or *tend to incite* an immediate breach of the peace.'' (*Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572. Emphasis supplied.)

In *Kingsley Books* v. *Brown* (354 U. S. 436, 441–442) the United States Supreme Court upheld section 22-a of the Code of Criminal Procedure which permitted an injunction against the sale of obscene books. In holding that '' the protection even as to previous restraint is not absolutely unlimited '', the court (Mr. Justice FRANKFURTER) said: '' The phrase ' prior restraint ' is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: ' What is needed,' writes Professor Paul A. Freund, ' is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539.''

Pressing his argument that the Commissioner's action constituted unlawful prior restraint of speech, the petitioner says that thereby the Commissioner in effect assumed the power of censorship of proposed speech. He argues (quoting from his brief), '' There may be consequences to a speaker for stirring up a group to illegal action \* \* \* or insulting a person to his face in personal quarrel, \* \* \* But it is censorship to try to guess or anticipate that disorder would follow or that the speaker will be lawless, with ensuing riot in resentment.'' But, under the showing here one does not have to guess or speculate that disorder is intended and would follow from the meeting and speech planned by the petitioner. Certainly, he is not to be given a permit on the theory that he should be given the benefit of a doubt where there is no doubt. This court is not required to let a known '' mad dog '' take a first bite. Neither

law nor reason dictates that administrative officers or the courts shall grant a permit tending to result in crime and disorder in furtherance of alleged right of free speech.

The action of the Commissioner was not intended or taken in furtherance of a purpose of censorship, but his determination was, in his words, taken to thwart "resultant disorder, riot and violence endangering city property and the safety and welfare of the residents of the City". Viewed in such light, his action was fully justified. Upon the undisputed record before this court, the making by the petitioner of the abusive, near treasonable and provocative speech which he unquestionably would make, will result in disorder and crime. The words that he would utter and his proposed meeting would be such that thereby a breach of the peace would undoubtedly occur. He would, upon receiving the permit, commit acts which unquestionably would be in violation of valid Penal Law provisions. (See *Feiner* v. *New York*, 340 U. S. 315; *People* v. *Nesin*, 179 App. Div. 869.) For instance, it is provided by the Penal Law (§ 722) of our State, that one commits the offense of disorderly conduct, and is punishable therefor, where "with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned," he

"1. Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior;

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;

"3. Congregates with others on a public street and refuses to move on when ordered by the police; [or]

"4. By his actions causes a crowd to collect, except when lawfully addressing such a crowd".

It is further provided by section 43 of the Penal Law that "A person who wilfully and wrongfully commits any act * * * which seriously disturbs or endangers the public peace or health, or which openly outrages public decency, for which no other punishment is expressly prescribed by this chapter, is guilty of a misdemeanor".

Under the circumstances, *Feiner* v. *New York* (*supra*) stands four-square for the authority of this State court to refuse petitioner relief. There, the petitioner had been convicted of disorderly conduct in violation of section 722 of the Penal Law. It appeared that while standing on a box and addressing an open-air meeting in the public street in the City of Syracuse, he made derogatory remarks concerning our then President, the American Legion, the Mayor of Syracuse, and other public officers.

Before a mixed audience, " He gave the impression that he was endeavoring to arouse the Negro people against the whites ". The crowd began to get unruly, and an officer requested the petitioner to stop. He continued talking and the officer placed him under arrest and ordered him to get down from the box. He was tried for disorderly conduct and the Trial Judge reached the conclusion " that the police officers were justified in taking action to prevent a breach of the peace ". Recognized by the State courts and the Supreme Court was the general right of the petitioner to make his particular speech in the public street, and as the Supreme Court pointed out, " Petitioner was * * * neither arrested nor convicted for the making or the content of his speech. Rather, it was the reaction which it actually engendered ". The Supreme Court reaffirmed its position that " A State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions." Nevertheless, it held that under the particular circumstances it was not improper for the officers to arrest and stop the petitioner in his speaking and it upheld his conviction, Mr. Chief Justice VINSON saying (p. 320): " The language of *Cantwell* v. *State of Connecticut*, 310 U. S. 296 (1940), is appropriate here. ' The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. * * * When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.' 310 U. S. at 308. * * * This Court respects, as it must, the interest of the community in maintaining peace and order on its streets. *Schneider* v. *State*, 308 U. S. 147, 160 (1939) ; *Kovacs* v. *Cooper*, 336 U. S. 77, 82 (1949). We cannot say that the preservation of that interest here encroaches on the constitutional rights of this petitioner ".

Finally, it is to be borne in mind that, in this type of proceeding, which is in the nature of a mandamus proceeding, the burden is upon the petitioner to show the necessity and propriety of granting the relief sought. And he may succeed only upon a demonstration of a clear legal right thereto. (*Matter of Durr* v. *Paragon Trading Corp.*, 270 N. Y. 464, 469; *Matter of Coombs* v. *Edwards*, 280 N. Y. 361, 364.) Here, certainly, as heretofore demonstrated, the petitioner has no clear legal right to any relief.

In any event, even if, because of limitations upon the discretion of the respondent Commissioner, his action is questionable, this court, upon the basis of the authorities aforesaid and in the exercise of discretion, may and should refuse the petitioner relief which would have the effect of encouraging him in his objectives which are clearly contrary to public policy and unlawful.

In a proceeding such as this, namely, an article 78 proceeding, in which an order in the nature of a mandamus order is sought to compel certain action by a public officer, the granting or withholding of relief to petitioner is a matter resting within the sound judicial discretion of the court. (*Matter of Pruzan* v. *Valentine*, 282 N. Y. 498; *Matter of Durr* v. *Paragon Trading Corp.*, 270 N. Y. 464, 469, *supra*; *Matter of Black* v. *O'Brien*, 264 N. Y. 272.) "Although the order is classed as a legal remedy, equitable principles largely control its issuance. * * * While the applicant must present an issue for the enforcement of a clear legal right, yet even then the court may determine whether, in the exercise of a sound discretion, it shall grant or withhold the order." (*Matter of Coombs* v. *Edwards*, 280 N. Y. 361, 364, *supra*.) Relief may be denied to a petitioner in this type of proceeding if he does not come into court with clean hands or where the granting of relief is contrary to public policy. (*Matter of Coombs* v. *Edwards, supra*; *Matter of Andresen* v. *Rice*, 277 N. Y. 271; *Matter of Dr. Bloom Dentist* v. *Cruise*, 259 N. Y. 358, *supra*; *Matter of Warehousemen's Assn.* v. *Cosgrove*, 241 N. Y. 580; *Matter of Salisbury* v. *Rogers*, 252 App. Div. 223; *Matter of Savage* v. *Commissioner of Licenses*, 3 A D 2d 717; *Matter of Frazier-Davis Constr. Co.* v. *Gerosa*, 6 A D 2d 112.)

In summary, let it be noted that I fully agree that it should be and is the policy of the courts to exercise discretion in favor of complete freedom of speech rather than in restriction thereof. A court should not, and may not prohibit any person from speaking merely upon the premise that it disagrees or is displeased with or even abhors the doctrine to be proclaimed in his proposed utterances. Nor should fear of an anticipated breach of peace or other consequences influence any court to silence a political zealot, however abominable his doctrine may be. But it is one thing for a court to restrain a person absolutely from speaking in a community and quite another for the court, in the interest of public peace and order, merely to refuse to affirmatively act to enable him to speak in a public park in the community. (Here, it should be noted that petitioner concedes

that he is not silenced — that he is not being restrained in speaking in the public street or in private hall in the city.)

For this court to remand the matter to the Commissioner for the purpose of his granting a permit to the petitioner to speak at some public park on an alternative date is only to evade the issue here. If, following such a remand, the Commissioner should specify a park site or date unsuitable to the petitioner, he will thereby be limited as to the place and time of speaking. There would thereby be limitation to a degree, and if there is a right to such limitation, then under the undisputed facts here, there would be justification to withhold from him altogether a permit to speak in a public park in the city.

The granting of relief to the petitioner Rockwell amounts to an invitation for a display of disgraceful mob action as is fully indicated by his prior speech-making incidents. We abhor mob action — for the havoc, the destruction, the injury and the misery it causes. We seek to guard against it, for, as history teaches us, mob action gnaws at the very heart of liberty and can be to free citizens the forerunner of the loss of most precious rights.

Where, as here, it clearly appears that the protecting of one individual in unrestrained freedom of speech is incompatible with public policy and order, the latter should prevail. In holding otherwise, this court would relinquish its role as a true guardian of the proper rights of all our people.

I concur in the granting by this court of the motion to strike the intervenor as a party to this proceeding.

RABIN, VALENTE and STEVENS, JJ., concur with BREITEL, J. P.; EAGER, J., dissents in part and votes to affirm in opinion.

Order entered on August 30, 1960, denying petitioner's application for an order directing the Commissioner of Parks of the City of New York to issue a permit to the petitioner to speak in Union Square Park and dismissing the petition, reversed, on the law, without costs, and the petition granted to the extent of remanding the matter to the Commissioner for the purpose of allowing petitioner to file a new application for a permit and for the Commissioner to proceed thereon in accordance with the opinion of BREITEL, J. P., filed herein. The intervenor, Department of New York Jewish War Veterans of the United States, Inc., is stricken as a party respondent in this proceeding and the caption of this proceeding is hereby amended by deleting and striking the name of said intervenor as a party hereto.