Wachtler, J.
(dissenting). I would dissent. We need no more than what is in this record to meet the important constitutional issue presented by this case. Certainly our own intelligence and the documentation made a part of this record details the malevolent bigotry which the Ku Klux Klan represents. In addition the affidavits from prisoners, a psychiatrist and the Assistant Deputy Commissioner of the Department of Correctional Services, as well as our own common sense is proof enough of the effect prison guards who are members of the Klan would have on a prison population comprised mainly of Blacks and hispanics.
Only a brief recitation of the facts is necessary. On September 4, 1975 appellant, Benjamin Ward, Commissioner of the New York State Department of Correctional Services, promulgated a directive forbidding employees from Ku Klux Klan membership. Suspicions arose that respondent, Joseph Curie, a prison guard at Elmira Correction Facility, was a member of the Klan. To investigate these suspicions, the department interviewed Curie on October 2, 1975. At the interview, although Curie answered questions concerning his activities while at work, he refused, on the advice of counsel, to answer questions probing into his suspected Klan membership. On October 31 he was served with a notice of discipline, charging insubordination, suspending him without pay from service, and informing him that the penalty of dismissal was proposed.*
Curie commenced this article 78 proceeding, converted into an action for injunctive and declaratory relief, seeking to bar his dismissal for refusing to answer questions regarding this suspected Klan affiliation. He also sought to have the commissioner’s directive declared unconstitutional. Special Term *1052 granted the guard’s motion for summary judgment, and the Appellate Division affirmed, one Justice dissenting.
Curie asserts that the commissioner’s policy of prohibiting prison guards from participation in the Ku Klux Klan unconstitutionally conditions public employment on the surrender of freedom of association. He further urges that termination of his employment for refusing to answer questions regarding his suspected affiliation with the Klan would similarly be unconstitutional. The commissioner contends that the State’s policy is compelled by the State interests in the effectiveness and security of the prison system and rights of the inmates to humane treatment. These interests, according to the commissioner, justify whatever abridgment there may be of the guard’s freedom of association.
It has long been recognized that the constitutional guarantees of freedom of speech and assembly necessarily imply like protections for the freedom of association (NAACP v Alabama, 357 US 449, 460; Abood v Detroit Bd. of Educ., 431 US 209, 233; Board of Educ. v Helsby, 37 AD2d 493, affd 32 NY2d 660). Since speech, assembly and association all serve a common purpose — to promote the free exchange of ideas — defeating any one of these rights might defeat them all (see Rice, Freedom of Association, Foreword, p viii, Robert McKay). Freedom of association therefore stands as a fundamental right in a free society (Buckley v Valeo, 424 US 1).
Guilt by association, repeatedly condemned as an unconstitutional violation of this right (De Jonge v Oregon, 299 US 353; Yates v United States, 354 US 298), may assume many forms. One such form, conditioning public employment on the surrender of this right, has therefore been held impermissible (Elrod v Burns, 427 US 347; Keyishian v Board of Regents, 385 US 589; Matter of Board of Educ. v Helsby, 37 AD2d 493, affd 32 NY2d 660, supra). Similarly the government’s power to compel disclosure of organizational affiliations is constitutionally circumscribed (Shelton v Tucker, 364 US 479; Bates v Little Rock, 361 US 516; but see Communist Party v Control Bd., 367 US 1). These restrictions help assure that legitimate governmental concern in the affairs of individuals and groups will not turn to unjustified oppression of beliefs and activities.
On the other hand, it is true, as the commissioner contends, that our commitment to liberty must sometimes yield to the exigencies of maintaining an orderly society (United States Civ. Serv. Comm. v Letter Carriers, 413 US 548, 567; Matter *1053 of Abdush-Shahid v New York State Narcotics Addiction Control Comm., 52 AD2d 846). A person may not exercise his rights without limitation at the expense of the rights of others (Lehman v City of Shaker Hgts., 418 US 298, 308 [Douglas, J., concurring]). Early in the development of constitutional law the courts were therefore called upon to arrive at a formulation to resolve conflicts between these interests. The principle which first emerged prohibited the government from infringing on fundamental rights unless exercised so as to pose "a clear and present danger [of] bringing] about the substantive evils that Congress has a right to prevent” (Schenck v United States, 249 US 47, 52; NAACP v Button, 371 US 415; Lewis v American Federation of Tel. & Radio Artists, 34 NY2d 265, 272). More recently the courts have announced that government may abridge a fundamental right only if the exercise of that right seriously jeopardizes a compelling State interest (Shapiro v Thompson, 394 US 618; First Nat. Bank of Boston v Bellotti, 435 US 765, 795; Phelan v City of Buffalo, 54 AD2d 262, 267). Accordingly in numerous cases the First Amendment freedom of association has bowed to the vital interests of the State (Matter of Shelofsky v Helsby, 32 NY2d 54; United States Civ. Serv. Comm. v Letter Carriers, 413 US 548, supra; Broadrick v Oklahoma, 413 US 601).
In assessing whether the government has established a compelling State interest in this case, one must first note that two closely interrelated State interests are involved: (1) to promote security and effectiveness in correction facilities by preventing arbitrary hostility and violence between guards and inmates, and (2) to protect the inmates’ right to be free from racial discrimination, thereby promoting rehabilitation.
Predictably, a determination of what constitutes a compelling State interest is no simple task. It is nevertheless clear that the government’s regulatory powers magnify where individual rights are exercised in public institutions — particularly prisons (Adderley v Florida, 385 US 39; cf. Grayned v City of Rockford, 408 US 104, 116; Pell v Procunier, 417 US 817, 827-830). The utter urgency of preventing violence in the prison system is at once apparent. "The interest in preserving order and authority in the prisons is self-evident. Prison life, relations between the inmates themselves and between the inmates and prison officials or staff contain the ever-present potential for violent confrontation and conflagration” (Jones v *1054 North Carolina Prisoners’ Union, 433 US 119, 132). The unfortunate truth of this observation is underscored by the nightmarish riot at Attica in 1971 which cost the lives of 9 guards and 34 inmates (Kwartler, Behind Bars: Prisons in America, p 32).
Unquestionably the Klan’s reputation for violence and illegality indicates that the employment of Klan members as prison guards will surely trigger a recurrence of violent disruption. The terrorism of the Ku Klux Klan is a matter of common knowledge, and amply supported by the record in this case (Report by the Committee on Un-American Activities, The Present Day Ku Klux Klan Movement [1967]; Epstein and Forster, Report on the Ku Klux Klan; Hoover, The Resurgent Klan, 52 Amer Bar Assn Journal, p 617). We must be mindful, however, that even if an organization engages in lawless and subversive activities, membership in the organization is not punishable absent proof of both knowledge of the illegality and the specific intent to further the organization’s illegal aims (Elfbrandt v Russell, 384 US 11). Abridging the freedom of association is prohibited for a mere advocacy of doctrine without the advocacy of unlawful action (compare Noto v United States, 367 US 290, with Scales v United States, 367 US 203). An "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression” (Tinker v Des Moines School Dist., 393 US 503, 508). Nor is the "mere desire to avoid discomfort and unpleasantness that always accompany an unpopular viewpoint” (Tinker v Des Moines School Dist., supra, at p 509). The First Amendment is truly tested not by the voice of conformity but by the call to dissent.
But the State does not seek by the disciplinary action taken in this case to punish prison guards for harboring unpopular beliefs. Rather it seeks to rid the prison system of racism, relieving the institutional strain which can only erupt into outbreaks of disorder.
Although the objectives and practical necessities of imprisonment require a retraction of prisoners’ rights (Price v Johnson, 334 US 266, 285), an inmate retains that degree of constitutional freedom consistent with incarceration (Pell v Procunier, 417 US 817, 822, supra; Palmer, Constitutional Rights of Prisoners, 2d ed, pp 35-54; Jones v North Carolina Prisoners’ Union, 433 US 119, supra). And it is most clear that "[prisoners are protected under the Equal Protection *1055 Clause of the Fourteenth Amendment from invidious discrimination based on race” (Wolff v McDonnell, 418 US 539, 556). We must always be alert that society’s right and obligation to punish those convicted of criminal offenses not be extended to strip them bare of all constitutional freedoms. During a criminal’s imprisonment the State must stand vigil as guardian of those retained rights for the prisoner himself is incapable of doing so.
The prison population in this State is more than 70% Black and hispanic. The Klan openly professes hatred towards these groups. Inmates forced into daily interaction with Klan members who are prison guards will inevitably face the indignity, degradation and threat of violence spawned by racial discrimination.
Of course the mere mention of the words "racial discrimination” is not enough to justify the commissioner’s directive. A claim of discrimination must be supported by sufficient evidence (cf. Matter of Rockwell v City of New York, 12 AD2d 272, affd 10 NY2d 721), I believe, however, that the standard of proof to substantiate such a claim, should be somewhat less stringent than that generally required to establish a compelling State interest. One reason for the lesser standard is simply that the government is not here seeking to curtail liberty to advance its own purposes. Rather, it is seeking to safeguard the individual rights of the prisoners, over whom it has complete control, where these rights are irreconcilably opposed to the rights of Klansmen prison guards. The factor of conflicting rights distinguishes this case from United States v Robel (389 US 258) where no such consideration was involved.
Since a conflict of constitutional rights is presented here, resolution of this case requires a balancing of the competing interests. Critical to this process is the awareness that prisoners are a captive audience, powerless to divorce themselves from associations thrust upon them. "While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it” (Lehman v City of Shaker Hgts., 418 US 298, 307, supra [Douglas, J., concurring]).
Yet another reason impels that a lesser standard of proof apply here. A compelling State interest is established by a grave and immediate threat of harm. In most cases, as with the danger posed by subversive activity to national security, merely belonging to an organization without the specific in *1056 tent to further its illegal aims is generally not enough to establish a compelling State interest because the likelihood is slight that grave and immediate harm will flow from membership alone. Hence, proof of illegal specific intent, indicative of a far more immediate threat, is necessary to meet the evidentiary burden. But racial discrimination is an entirely different matter. The mere presence of a guard who believes in Klan doctrine, may subtly, if not blatantly, infest the prison environment with the taint of racism, an affliction which can paralyze the rehabilitative process. Even if the prisoners do not know that a guard is a Klansman his attitudes may nonetheless be conveyed. The perception by inmates of these attitudes may breed frustration, hatred, and disruption. Hence grave and immediate harm may be caused by the communication of racist attitudes regardless of the absence of illegal specific intent or easily demonstrable racist behavior (cf. Cook v Hudson, 511 F2d 744; see, generally, Note, Nonrenewal of Teachers’ Contracts for Enrolling Children in a Private Segregated School, 7 U Tol L Rev 229).
Before termination of employment may be predicated on Klan membership, however, the record must show the probable effect of a Klansman’s attitudes on prisoners. In his affidavit, Edward Kaufman, Chief Psychiatrist and Medical Director at the Lower Eastside Service Center for the City of New York, stated "My review of material on the Klan emphasized that the history of this movement was such that an employee of the New York State Department of Corrections who was a member of the Klan could not do so without seriously endangering the mental health and rehabilitation of all inmates.” Similarly, Lewis L. Douglass, Executive Deputy Commissioner of the Department of Correctional Services of the State of New York, concluded "that many black inmates are thoroughly terrorized of the Ku Klux Klan, and of correction officers whom they believe to be members of the Ku Klux Klan.” In addition, numerous letters written by inmates of various New York prisons substantiate these opinions and indicate that the presence of Klansmen in our prisons poses an immediate danger of violence. This proof indicating the fear, interference with rehabilitation and threat of disruption triggered by the presence in the prison system of guards who support Klan dogma, is sufficient to withstand a motion for summary judgment. Indeed it is curious that the majority, unwilling to accept the proof of the " 'probable’ effect” of Klan *1057 membership on the prison system, characterizes what would usually be considered expert opinion evidence as "nothing more than speculation.”
That is not to say that the commissioner will ultimately prevail, but on this record he should not be deprived of the opportunity to submit further proof. To deny him such an opportunity would be to close our eyes to an explosive problem in correctional institutions, and to prevent the commissioner from taking steps to defuse the volatile prison environment. If the threat to the prison system is shown to be grave and immediate, it would be irresponsible and indeed indefensible to await catastrophe as the necessary antecedent to preventive action. The First Amendment does not require such a result, and the conscience will not allow it.
The order of the Appellate Division should be reversed, respondent’s motion for summary judgment denied, and the case remitted to Special Term.
Chief Judge Cooke and Judges Jasen, Jones and Fuchs-berg concur; Judge Wachtler dissents and votes to reverse in a separate opinion in which Judge Gabrielli concurs.
Order modified, with costs to respondent, in accordance with the memorandum herein and, as so modified, affirmed.

 Respondent has been reinstated pending the outcome of this action.