George L. ROCKWELL, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 2740, 2741.

Municipal Court of Appeals for the
District of Columbia.

Argued April. 17, 1961.

Decided July 11, 1961.

Lincoln Rockwell, appellant, pro se.

H. Thomas Sisk, Asst. Corp. Counsel,
with whom Chester H. Gray, Corp. Coun-
sel, Milton D. Korman, Prin. Asst. Corp.
Counsel, and Hubert B. Pair, Asst. Corp.
Counsel, Washington, D. C., were on the
brief, for appellee.

Before HOOD and QUINN, Associate
Judges, and CAYTON (Chief Judge, re-
tired) sitting by designation under Code,
§ 11–776(b).

HOOD, Associate Judge.

Appellant, the leader of the American
Nazi Party, was arrested for disorderly
conduct [1] on July 3, 1960, after rioting and
fighting broke out at a rally he and his
followers were holding in the park area

1. Code 1951, § 22–1121, Supp. VIII.

at Ninth Street and Constitution Avenue, N. W. While awaiting trial on that charge he was again arrested for disorderly conduct on July 24, 1960, this time at Judiciary Square during the course of another outdoor gathering which he was attempting to address.

The two informations were consolidated for trial without a jury, and appellant was found guilty on both charges. He appeals the two convictions claiming that his freedom of speech, as guaranteed by the First Amendment, was obstructed by the arrests for disorderly conduct; that he was unable to obtain service of process on key defense witnesses; and that a certain letter he offered in evidence was wrongfully excluded by the trial court.

At trial the evidence revealed the following circumstances leading to the arrests. On July 3, 1960, appellant and his followers held a rally at Ninth Street and Constitution Avenue, N. W. At about 2:00 p. m. appellant began to speak from a platform within a roped-off area. Standing inside the enclosure were appellant's followers, some of whom wore red swastika armbands. Numbering 100 to 300 people, the audience outside the enclosure included many opponents of appellant's theories and party. Fourteen members of the U. S. Park Police were also in the audience, though only eight of them were in uniform. The spectators greeted appellant's opening words with hissing, booing and derisive chanting, the noise at times growing so loud that appellant could not be heard. This turmoil continued for about an hour and a half until suddenly an unknown number of spectators breached the enclosure and attacked appellant and his followers. As the fighting began the police moved in and arrested appellant, all of his followers and apparently some of the spectators who had participated in the attack.

During the trial there was a great deal of prosecution testimony concerning appellant's reaction to the crowd noises interrupting his speech. Witnesses testified that at different times they heard appellant shouting at the audience in the following fashion:

"All right, you dirty Jews, come on and holler."

"Come on, you white people, get up front and move the Jews back."

"Come on, you bunch of Jews, let's hear it."

"[Y]ellow Jews" and "Communist Jews."

"Jew. Jew. Jew. Jew."

One Government witness also stated that at one point appellant "started shouting, 'Jews, Jews, sick—dirty Jews, filthy Jews * * *,'" and shortly thereafter the spectators broke through the ropes and attacked appellant and his followers. Another prosecution witness testified that in the course of his speech appellant referred "to the Jewish race as traitors; or labeled the race as traitorous to our country."

Conceding he impatiently shouted, "Dirty Jews. Rotten Jews. Miserable Jews. Shut up, Jews. Go on and yell, Jews," appellant denied he made the other statements attributed to him. He stated he had been forewarned of possible disorder by Government officials and had done all in his power to prevent trouble, short of refusing to exercise his constitutional right of free speech. Even during the course of his speech he sent several of his men to warn the police that the crowd was getting dangerously unruly. According to appellant, the police replied to his warning by informing his men that the way to restore order was for appellant to stop talking.

On the second occasion that appellant was arrested he was conducting another rally in Judiciary Square. This time appellant—his followers in two ranks directly behind him—began to address an audience of about fifty people. As soon as appellant began his speech the spectators started to heckle him. Appellant responded by calling them "Jews" and "cowards," thereby in-

creasing the intensity of the badgering from the audience. According to one prosecution witness, appellant "sort of lost his temper, and he turned around, and he says, 'Go get 'em, boys.'" At the command appellant's followers with their arms folded in front of them moved into the audience. One spectator was struck under the chin, and as a result appellant and his men were arrested for disorderly conduct.

Denying that anyone in the audience had been assaulted, appellant explained his actions on July 24 by referring to the near riot on July 3. Conscious that more trouble was to be expected if he spoke again, he had trained his men to move out into the audience at the first sign of possible disorder. Apparently these men were to surround hecklers and shout back at them, all the time under strict orders to keep their arms folded in front to avoid any suggestion of an invitation to combat. As to the command he gave on July 24, appellant testified he merely said, "First and second squads move out," which was the signal for his men to go into the audience in the manner described above.

Appellant's essential argument for reversing his conviction for disorderly conduct on July 3 is that his arrest on that occasion resulted in the denial of one of his constitutionally protected freedoms—the right to free speech; that on July 3 the police by their inaction allowed a hostile, unruly audience to shout him down and finally attack him for the expression of his opinions; and that even though his theories were offensive to a great many of the spectators, this gave them no right to attack him and gave the police even less reason to arrest him after the fighting broke out. To allow his conviction for disorderly conduct on July 3, he argues, would "give any mob the power to use the police and courts * * * to silence any speaker and drive him into hiding with force and violence, merely by claiming they were 'annoyed' or 'disturbed' by the lawful expression of opinions, ideas, facts and doctrines of other citizens, * * *."

As recently as its current term the Supreme Court has reiterated the holding that freedom of speech under the First Amendment is not an "absolute" that gives a citizen "an unlimited license to talk." Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 1006, 6 L.Ed.2d 105. Certain forms of speech have always been considered outside the perimeter of First Amendment protection. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031.

In the appeal of appellant's July 3 conviction we have no question of prior restraint which, when applied to speech, must always be carefully and critically scrutinized. Rather we have an arrest for disorderly conduct made *after* appellant's remarks led to fighting. We think that the mere recitation of the evidence adduced to show the offensive and insulting nature of some of appellant's statements demonstrates quite clearly that appellant's arrest was not prohibited by the First Amendment. As the Supreme Court said in Cantwell v. State of Connecticut, 310 U.S. 296, 309, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

The conviction that grew out of the July 24 charge of disorderly conduct does not even raise a constitutional question. It is clear from the record that appellant ordered his followers into a hostile audience to stop the heckling that was interrupting his speech. Under the circumstances we cannot conceive of a better way to cause disorder than that adopted by appellant. Whether appellant intended that result is not controlling. An assault on one of the

spectators did occur as a direct result of appellant's command to his followers to move into the audience and the trial court could without error convict appellant of disorderly conduct.

 Appellant has claimed that he was denied due process because he could not get service on a number of witnesses who, he alleged, were essential to his defense. One of these witnesses is the National Capital Parks Director who was in the hospital at time of trial. The others are unidentified in the record as to occupation, but at oral argument before this court appellant said they were Government employees who were at the scene on July 3. The record sheds no light as to what these latter witnesses would testify, or as to why appellant could not get service. In substance all appellant did at trial was to point out the failure of service and object to it. The record affords us no basis for holding that the failure of service substantially affected or hindered appellant in his defense.

The final error alleged by appellant concerns the exclusion of a letter which he offered in evidence. We do not have the letter before us, but appellant claims he received it from the National Capital Parks Director who warned that he had received information that violence might erupt if appellant insisted on speaking on July 3. Apparently appellant believes the letter would have supported his claim that because of the warning he took every possible measure to avoid trouble and thus had no intent to cause violence on July 3.

Assuming that the letter warned appellant of possible violence and that he tried to avoid trouble, we fail to see how the letter's exclusion can be categorized as prejudicial error. Obviously appellant bases his claim of error on a theory that intent is a necessary element in the proof of disorderly conduct. Appellant, however, was charged and convicted under a statute which reads in part as follows: "Whoever,

with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby * * *." Code 1951, § 22–1121, Supp. VIII. It is clear that the language quoted is to be read disjunctively, and that one lacking an intent to be disorderly may nevertheless be guilty of the charge if his conduct is "under circumstances such that a breach of the peace may be occasioned thereby * * *." The only question the trial court had to decide was did appellant's statements constitute disorderly conduct under the circumstances of July 3. As we have indicated, we believe there was sufficient evidence for the trial court to answer as it did.

Affirmed.