Carl R. ALLEN, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 3086.

District of Columbia Court of Appeals.

Argued Nov. 26, 1962.

Decided Feb. 8, 1963.

William J. Garber, Washington, D. C., with whom William A. Bachrach, Washington, D. C., was on the brief, for appellant.

Joseph G. Hitselberger, Asst. Corp. Counsel, with whom Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and Hubert B. Pair, Asst. Corp. Counsel, were on the brief, for appellee.

Before HOOD, Chief Judge, and QUINN and MYERS, Associate Judges.

HOOD, Chief Judge.

Appellant and a codefendant, not a party to this appeal, were charged with and convicted of disorderly conduct under Code 1961, §§ 22–1107 and 22–1121. Specifically, it was charged in the information that they "did drag and walk upon the flag or symbol of a foreign government in the presence of a large gathering of people, and under circumstances such that a breach of the peace may be occasioned thereby, acted in such a manner as to annoy, disturb and be offensive to others."

Appellant is a member of the American Nazi Party. Dressed in the uniform of that organization, he and the codefendant appeared at the corner of Tenth Street and Pennsylvania Avenue, Northwest, near the Department of Justice Building. Pickets representing the Non-Violent Action Group and the Congress of Racial Equality were already there, protesting alleged police brutality in Louisiana. Appellant testified that he requested permission from the police officer there in charge to counter picket, that permission was granted, and he and

his partner were assigned to a circle in the sidewalk. Photographs taken at the scene by the police photographer, and admitted in evidence, show the codefendant carrying an American flag and appellant displaying a placard reading "More Police Brutality for Reds," and dragging a banner on the sidewalk and trampling it. This banner, it is agreed, was red and bore a gold hammer and a sickle in the center. After appellant and his partner had made nine turns around the circle, they were ordered by the police to halt, photographs were taken, and they were then informed they were under arrest. Appellant estimated that ten minutes elapsed from the time he arrived at the street corner to the time of arrest.

Estimates of the number of people present when appellant and his partner arrived ranged from 50 to 300. The officer testified that these people pressed in closer toward the defendants, but that they were held back by a line of police officers. Asked whether defendants' actions disturbed him, he replied in the affirmative, saying he disliked "to see any country's flag dragged on the ground and disgraced that way." One of the pickets said he was angered at the imputation that his group would be particularly attached to the Russian flag and annoyed by having it trampled. He understood defendants to be implying that he was a Communist. Another picket based his objections on the disrespect defendants' actions showed to a country recognized by the United States.

Considerable defense effort at trial was directed to establishing that the banner was not the Soviet flag, since the hammer and sickle were in the center and the star was missing. Defendants claimed they were attempting to portray the banner of "International Communism." In arguments before the trial court, however, defense counsel as well as the government treated the act as an insult to a foreign government. Defendants contended it was impossible to disgrace the flag of a government already disgraced in the eyes of "red-blooded

Americans"; and the government stressed our continuing efforts to promote friendly relations with the Soviet Union. The trial court apparently saw the case in the same light. It pointed out that the flag was that of a government which the United States recognizes, that "we have a responsibility to see to it that the symbols of that nation have the same respect in this country that we would hope for in their country," and that defendants had "violated that particular responsibility." The court further found that a "serious breach" would have resulted had defendants not been restrained by the police, and found them guilty of disorderly conduct.

Appellant, relying on the free speech guarantees of the First Amendment, argues that he was simply expressing a political view and that the onlookers' testimony that they were offended by his act is insufficient as a basis for conviction. The government contends that the trial court had sufficient evidence that a breach of the peace was imminent at the time of the arrest, and that appellant's conduct was not entitled to the protection of the First Amendment.

The primary question is whether the message conveyed by appellant was of such a nature as to come within the ambit of the First Amendment protection, or whether it must be placed in the categories of speech which the Supreme Court has held are not so protected. See Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031. The appellant's conduct, and not the crowd's reaction to it, must be the starting point, for "the measure of the speaker is not the conduct of his audience." Rockwell v. Morris, 12 A.D.2d 272, 211 N.Y.S.2d 25, 34. Audience reaction, and the immediacy of disorder, become significant elements of proof only after the speaker "passes the bounds of argument or persuasion and undertakes incitement to riot." Feiner v. People, 340 U.S. 315, 321, 71 S.Ct. 303, 306, 95 L.Ed. 267. See also, Rockwell v. District of Columbia, D.C.Mun. App., 172 A.2d 549. So long as the com-

munication partakes of genuine expression of a point of view, it is entitled to protection under the First Amendment. That his audience is disturbed or angered is not in itself reason to curb the speaker. Terminiello v. City of Chicago, 337 U.S. 1, 69 S. Ct. 894, 93 L.Ed. 1131. Picket lines, street corner rallies, and other public assemblies thrive on controversy. Their purpose being to arouse public opinion in their favor, their position is often stated in inflammatory terms. It is understandable that those differently persuaded may become offended thereby. Probably every picket line is offensive to someone, but where the communication falls within the constitutional guarantees, a conviction of disorderly conduct cannot rest on the hostility of the audience.

The government contends that the defendant's conduct was not worthy of protection under the First Amendment, and that our holding in Rockwell v. District of Columbia, supra, is dispositive of this appeal. We cannot agree. Considering appellant's act in its entirety it is obvious that it does not sink to the same level as the type of speech for which Rockwell's conviction was affirmed. In that case the words, as set forth in the opinion, consisted simply of naked epithets and personal abuse and could in no sense be termed communication of information or opinion. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. There was not in this case the direct vilification of members of the audience, almost tantamount to an invitation to physical violence, which characterized the Rockwell case; there was only a silent demonstration, without any oral communication between appellant and the onlookers. Neither the wording of appellant's picket sign, nor his trampling on the flag, however reprehensible, is akin to the libels, the fighting words, or the incitement to riot which the Supreme Court has held are not entitled to First Amendment protection.

■ The totality of the evidence against appellant and his codefendant is that their actions caused a crowd to press close to them. Whether this was done out of curiosity or otherwise is not shown, for the officer testified to no murmuring by the crowd, no open displays of anger or threats of violence. A few members of the crowd did testify that they were annoyed, irritated and made angry, but this falls far short of proof of an imminent riot or breach of the peace. See Garner v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207.

Reversed with instructions to enter judgment of acquittal.

QUINN, Associate Judge.

I concur in the result reached by the majority because it is clear from the record, and particularly the findings of the trial court, that although appellant was charged with disorderly conduct he was convicted of unlawfully displaying a flag, banner or device designed or adopted to bring a foreign government into public odium.[1] I cannot ascribe, however, to an opinion which regards society's interest in public order as the antagonist of free speech.[2] My colleagues have taken a cavalier attitude toward the exigencies of the situation under which the police must maintain public order "by reiterating generalized approbations of free speech." They have gone so far as to say that "audience reaction, and the immediacy of disorder, become significant elements of proof only after the speaker 'passes the bounds of argument or persuasion and undertakes incitement to riot.'" It is totally unrealistic to assume that disorder will not result before the speaker sinks to this level of communication. And if there is a breach of the peace,

1. Code 1961, § 22–1115.

2. Mr. Justice Jackson dissenting in Terminiello v. Chicago, 337 U.S. 1, 13–14, 69 S.Ct. 894, 899, 93 L.Ed. 1131 (1949).

"it is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker." [3] One final word. This is not a case of prior restraint, nor can one say in good conscience that the police in this city have served as a readily available instrument for the suppression of unpopular ideas disseminated in public places. On the contrary, the history of appellant's organization is replete with instances where, had it not been for the protection of the police, its spokesmen would have been summarily silenced.

3. Mr. Justice Frankfurter concurring in Niemotko v. Maryland, 340 U.S. 268, 289, 71 S.Ct. 325, 336, 95 L.Ed. 267 (1951).