Frank **COLLIN**, Plaintiff-Appellant,

v.

**CHICAGO PARK DISTRICT** et al.,
Defendants-Appellees.

No. 71–1377.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 28, 1971.

Decided April 27, 1972.

Rehearings Denied May 18 and
June 19, 1972.

David Goldberger, Barbara P. O'Toole, Chicago, Ill., for plaintiff-appellant; Edgar Bernhard, Chicago, Ill., of counsel.

Neil F. Hartigan, William M. Ward, Chicago, Ill., for defendants-appellees.

Before DUFFY, Senior Circuit Judge, and KILEY and PELL, Circuit Judges.*

PELL, Circuit Judge.

This appeal is from a judgment of the district court denying plaintiff Collin's motion for a preliminary injunction and dismissing his action.

The case below arose out of Collin's unsuccessful efforts to secure a permit for holding a rally in Marquette Park, Chicago. Specifically, the complaint sought to compel the defendant Chicago Park District to issue such a permit for Sunday, April 25, 1971, as well as seeking declaratory and injunctive relief.

Collin, leader of the National Socialist Party of America, also known as the Nazi Party, filed his action pursuant to 28 U.S.C. §§ 1331, 1343 and 2201 and 42 U.S.C. § 1983. Designated as defendants were the Chicago Park District and various functionaries thereof, herein collectively referred to as "Park District."

The complaint and evidence taken at hearings below fairly establish the following general background.

In May of 1970, Collin filed an application for a permit to hold a demonstration in Marquette Park for purposes of speech making on June 28, 1970. The estimated attendance was indicated as going as high as 500 persons. Under date of May 22, 1970, a letter from the Park District recreation director denied permission without stating any reasons. In late July 1970, Collin again applied for permission to hold a demonstration for the purpose of making speeches at Marquette on September 6, 1970. No response was received from the Park District until Collin made contact with officials thereof on August 25, 1970, and was informed that his application had been denied. He then learned, independently, of his right to administrative review and appealed his denial. After a hearing, the denial was upheld in a letter dated September 1, 1970.

The letter of denial referred to the fact that the area sought to be used was normally used on Sundays in warm weather as a family picnic area and was in the vicinity of recreational facilities. The letter then referred to the fact that a public assembly held by Collin in Gage Park September 27, 1969, "led to a public commotion which required police presence and action, and which was, or could have led to, a riot or breach of the peace."

The letter then adverted to the fact that Collin had stated that he would produce for review by the Park District all of the pamphlets, literature and posters he intended to use at his proposed public meeting but he had refused to do so at the review. The writer of the letter stated his conclusion in the light of this refusal and in the light of literature previously distributed by Collin on Park District property that Collin intended to violate the Criminal Code of the State of Illinois.

The letter was then completed as follows:

"Such conclusion is particularly disturbing in light of the fact that this abrasive and excoriating material is to be disseminated in an area normally used by families and others for picnics and recreational purposes, and has previously resulted in a public commotion which required police action and protection.

"4. In connection with the denial of the pending application, may I again point out the four free forum areas where applicant may conduct a public meeting and assembly on Park District property without a permit, as defined in Section 17–8.2 of the Park District ordinances."

---

* Judge Kerner was a member of the original panel hearing oral argument in the case; however, he did not participate in the adoption of this opinion, having been re-placed on the panel by Judge Kiley. The panel as then constituted, on the briefs and the recorded original oral argument, deemed reargument unnecessary.

On January 15, 1971, Collin again applied for permission to hold a rally to speak at Marquette Park, this time on April 25, 1971. He heard nothing from the Park District and the suit followed which eventually resulted in this appeal.

On May 17, 1971, Collin filed in this court an Emergency Application for Temporary Injunction Pending Appeal seeking an order compelling the issuance of the permit to speak in Marquette Park. The application was denied by a two to one vote by this court which held that it "is inappropriate for this court to endeavor to resolve as a matter of first impression on an emergency basis complex factual questions going to the form of relief, if any, which might be appropriate here."

The matter now before us assumes, as we see it, the proportions of a classic First Amendment case in which there has been a denial by a governmental body of the freedoms of speech and assembly because the views which that body assumed would be expressed were unacceptably, if not indeed loathsomely, alien to the prevailing thought. Such a resultant prior restraint appears to us to be an unconstitutional interdiction. We therefore must reverse even though from a personal point of view we share the community repugnance toward the views which Collin could be expected to utter and publicize if he adheres to the beliefs presumably expressive of his opinions at an earlier time.

The record in this case contains several leaflets setting forth aims and accomplishments of the National Socialist White People's Party in 1969. Collin was active in this organization, apparently a predecessor of his 1970 National Socialist Party of America.

The animus of the 1969 literature seemed to have been directed principally at black people and communists. The horizon apparently was considerably broadened the following year as reflected by an exhibit in the record entitled "Thirty Point Program for the National Socialist Party," which Collin testified was the 1970 program of the party. Reminiscent of a page from the history of the Third Reich, the list of the organization's anathematic subjects included communists, the federal income tax, "cheap quality products" (whatever they may be), Negroes, the Federal Reserve System, Jews, the United Nations, incompetent bureaucrats, teachers disloyal to the "Aryan race," pornography peddlers and small families. If this list is not already illustrative of the fact that hatred collects diverse mates, it is noted that one of the program points was the immediate prosecution of all "who have been proven guilty of polluting our natural resources." Although two of the points were "the shooting on sight of all Black and anarchist rioters and looters" and "liquidation of all Communists, pro-Communists, Zionists and other treasonous organizations," point thirty was "installment of the above Program through legal, Constitutional means."

No matter how substantially distasteful most of the program may have been to those dealing with Collin's permit applications, nevertheless the fundamental essentiality of freedom of speech and freedom of assembly as viable tenets is not in dispute in this litigation.

Thus, the Park District while denying the permit stated, "We must under constitutional law, concede [Collin] full and free right to speak and assemble without censorship or prior restraint somewhere on Park District property."

Thus, also, the district court in denying judicial relief stated:

"Freedom of speech is the most cherished of our liberties. It is the symbol and test of a healthy free society. The Constitution is a framework for the protection of minority rights, unpopular or not. The right to free speech and peaceful assembly of a minority group is especially important in this day of increasing Federal reserve towards interference in State action and increasing emphasis on the rights of society over the rights of the individual."

To determine whether this case falls without the broad sweeping ambit of the constitutional guaranty, it is necessary to look at certain additional material facts fairly established by the record.

The site at which Collin sought to hold his rally was in Marquette Park, Chicago. If he were to have a receptive audience, Marquette Park appeared to be his most likely place as it was centrally located in the area in which the bulk of his supporters resided. Marquette Park was and is primarily used for a family picnic area. However, it was not a small, exclusively picnic area. There was no flat ban on demonstrations. Other rallies had been held in the park.

Further, it appears clear in cases other than Collin's that when a requested area in Marquette Park had not been deemed appropriate, suggestions had been made by the Park District which would permit a gathering in another part of the same park.

The district court noted this fact and stated, "If they afford this service to some, it seems reasonable, under the Fourteenth Amendment of the Constitution of the United States they ought to afford this service to all."

Collin's several applications for the permit always specified Area No. 3 of Marquette Park because the particular site formed a natural forum with a hill from which he could speak. In addition, there were nearby sanitary facilities. It seems abundantly clear, however, that Collin would have settled for some other area in Marquette Park.

It also appears clear that the Park District intended to reject any Marquette Park application made by Collin. Rather than suggesting another area in Marquette Park, the superintendent of the Park District pointed out four free forum areas where Collin might conduct a public meeting and assembly on Park District property without a permit as defined in § 17–8.2 of the Park District Ordinance. The four areas were Washington, Garfield, Lincoln and Burnham Parks. Two of the free forum areas are located in parks used almost exclusively by blacks, being Garfield and Washington, and a third, Burnham, although "at one time predominantly Negro, . . . has gone right now to about 50/50 situation." The district court recognized that to require Collin to speak at any of these free forum areas would substantially increase the threat of violence which the Park District itself had used as its reason to deny plaintiff's permit to speak in Marquette Park. The fourth suggested area was Lincoln Park, which was at least nine miles from plaintiff's headquarters and the bulk of his supporters.

Turning next with regard to the factual situation to what appears to be the real underlying basis for the denial of the permit, the possibility of violence if the rally were held, we note the following significant statements in the district court's judgment:

"I have reviewed all of the evidence, including pamphlets and handbills previously distributed by the plaintiff and his organization. Rather than peaceful, the entire thrust of the organization seems to be devoted to the loathsome activity of race-baiting. The prior meetings have been attended by violence almost without fail, and the activities of the organization seem to be dedicated to violent acts of one sort or another. Under such circumstances, it seems wholly unreasonable to have allowed any of plaintiff's applications."

However, upon examination, the principal evidence of violence was contained in the 1969 Annual Report of the Midwest Division of the National Socialist White People's Party, the predecessor organization of plaintiff's party. First of all, this report, while it detailed acts of violence by plaintiff's supporters, referred to the calendar year 1969 well over a year prior to the date on which the plaintiff desired to hold his demonstration. Secondly, an analysis of the incidents reflects that for the most part the violence claimed by the report arose

out of attacks on someone else's demonstration. There is no background of violence reflected insofar as the Marquette Park area was concerned.

The pertinent portions of the ordinance upon which the Park District based its denial of this permit read as follows:

> "No application for a permit made pursuant to this chapter shall be denied except for one or more of the following reasons: . . . (c) The use of the facility intended by the applicant would present an unreasonable danger to the health or safety of the applicant, of other users or of the public; . . . (e) The use of the facility intended by the applicant is inconsistent with the purpose for which facility has been established or designated. . . ." Park District Code § 17–8.4 [1]

Little purpose will be served by adding another extended dissertative survey to the legal literature pertaining to freedom of speech and freedom of assembly. Indeed, the broad sweep of the First Amendment privilege was well stated by the district court in that part of its opinion hereinbefore quoted. Despite dissenting opinions now and then in particular contexts, the pillar of recognition has remained staunchly resistant to chipping efforts emanating from a distaste for the words spoken or desired to be spoken or because of the purpose or ideology of the group assembling or proposing to assemble.

■ Turning first to the second prong of the Park District's basis for denial, the statement of the factual situation hereinbefore set out would seem sufficient to dispel the claim that the proposed use was inconsistent with the purpose for which the facility has been designated. In fact it appears that the Park District would not deny Collin or any other person the right to roam through the park in question distributing literature. The thrust of the denial, therefore, was a denial of the right of assembly but this in turn constitutes a denial of effective communication, the essence of free speech. Marquette Park was not just a part of a city block or a tiny neighborhood picnic area but covers some blocks in the south side of Chicago.[2] While it apparently was extensively used for family picnics, it is manifest that it was not exclusively so used.

We do not need to reach the question of whether an area of this size dedicated to the public use could be held for picnic use to the exclusion of other uses precluding free speech and free assembly other than picnicking.[3]

■ The fact here was that it was not exclusive and, as already noted, other groups were permitted to hold large non-family-picnic rallies. The Park District cannot declare Marquette Park

---

1. There was also reference in the briefs to a third subsection of the ordinance reading as follows:

   " . . . (h). On prior occasions the applicant has committed serious or chronic violations of part district regulations or has engaged in illegal activity on park district property." Park District Code § 17–8.4

   There appears to have been no particular reliance on this subsection as justification for the permit denial and upon the basis of our First Amendment disposition of this appeal, reliance would have been misplaced.

2. The Fourth Circuit recently upheld the constitutionality of an ordinance which limited the total number of people who could assemble in a small park "in an extremely congested downtown area." Blasecki v. Durham, 456 F.2d 87 (4th Cir. 1972).

3. "The privilege of a citizen of the United States to use the streets and parks for communication of views . . . may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." Hague v. C.I.O., 307 U.S. 496, 515–516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (Opinion of Mr. Justice Roberts).

closed to all speakers at assemblies and then let some such speakers continue to use it. Niemotko v. Maryland, 340 U.S. 268, 272–273, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951), and Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953).

"The inquiry in every case must be that stated by Chief Justice Hughes in Cox v. New Hampshire, 312 U.S. 569 [61 S.Ct. 762, 85 L.Ed. 1049]—whether control of the use of the streets for a parade or procession was, in fact, 'exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.' Id. at 574 [61 S.Ct. at 765]." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 155, 89 S.Ct. 935, 941, 22 L.Ed.2d 162 (1969).

The Supreme Court mandates a case-by-case analysis of the application of a given piece of legislation which on its face may be fair and impartial in appearance: "yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886).

While the Park District establishment of the free forums or "speaker's corners" in four areas of the city is commendable, it is no answer to the restriction that has here been exercised. While "the rights of free speech and assembly . . . do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time," Cox v. Louisiana (I), 379 U.S. 536, 554, 85 S.Ct. 453, 464, 12 L.Ed.2d 471 (1965), this does not mean that these rights can be so restricted as to become virtually meaningless.

In Schneider v. New Jersey (Town of Irvington), 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), several municipal ordinances restricting the distribution of handbills were held to be unconstitutional. The Court stated:

"It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places. But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." 308 U.S. at 163, 60 S.Ct. at 151.

Here, Marquette Park is admittedly an appropriate place to hold an outdoor meeting and this right cannot be denied purely because the plaintiff may also use the "free forum" areas. The use of the free forums, not as an alternative, but as the sole available places for assembly and speech placed an unduly heavy burden on Collin's exercise of First Amendment rights.

We turn now to what is, in this case, possibly the only constitutionally permissible ground for the permit denial, the probability of imminent violence by Collin and his supporters. Many of the cases in this area have been ably discussed in Judge Breitel's opinion in Rockwell v. Morris, 12 A.D.2d 272, 211 N.Y.S.2d 25 (1961), aff'd mem., 10 N.Y.2d 721, 219 N.Y.S.2d 268, 176 N.E.2d 836 (1961), amended, 10 N.Y.2d 749, 219 N.Y.S.2d 605, 177 N.E.2d 48, cert. denied, 368 U.S. 913, 82 S.Ct. 194, 7 L.Ed.2d 131 (1961).

One of the most recent cases on the issue of prior restraints on First Amendment rights is New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). While diverse views were expressed in the various opinions emanating from the Court in that case, it may be fairly said that one matter upon which all of the justices

agreed was the continuing vitality of the cases on prior restraint on expression as follows:

" 'Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 [83 S.Ct. 631, 9 L.Ed.2d 584] (1963); see also Near v. Minnesota, 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357] (1931). The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 [91 S.Ct. 1575, 29 L.Ed.2d 1] (1971)." 403 U.S. at 714, 91 S.Ct. at 2141 (1971).

It seems equally fair to say that the Park District has an extremely heavy burden in justifying the prior restraint on Collin's First Amendment right.

In Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), the Court's reversal was based on the narrow ground that the statute provided no standards for administrative discretion in granting or denying a permit and thereby violated the First Amendment. But the Court went on to state in positive terms that the defendant's unbridled religious invective which had in the past caused serious disorders when he spoke in congested portions of mid-Manhattan was not a permissible basis for denial of a permit:

"The court below has mistakenly derived support for its conclusion from the evidence produced at the trial that appellant's religious meetings had, in the past, caused some disorder. There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence. 'In the present case, we have no occasion to inquire as to the permissible scope of subsequent punishment.' Near v. [State of] Minnesota, 283 U.S. 697, 715 [51 S.Ct. 625, 75 L.Ed. 1357] (1931)." 340 U.S. at 294–295, 71 S.Ct. 315.

More recently in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Court struck down a conviction of several Ku Klux Klan members under the Ohio Criminal Syndicalism statute. After discussing Dennis v. United States, 341 U.S. 494, 71 S. Ct. 857, 95 L.Ed. 1137 (1951), and its progeny, the Court cited Noto v. United States, 367 U.S. 290, 297–298, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961), stating " 'the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' " Brandenburg v. Ohio, 395 U.S. at 448, 89 S.Ct. at 1830. The Court held that to be constitutionally valid a statute must distinguish between "mere advocacy" and "incitement to imminent lawless action," punishing only the latter.

A beginning point in the development of the law of the present subject is found in the oft-quoted "clear and present danger" test of Mr. Justice Holmes. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

Since it is clear from *Brandenburg* that only "incitement to imminent lawless action" as contrasted to "mere abstract teaching" can be punished after the fact, it is obvious that in order to sustain a prior restraint on speech the Park District had to sustain the heavy burden that "incitement to imminent lawless action" would in fact take place and that there existed a high probability that this incitement would be effective. As one commentator has noted:

"Legitimating the consideration of intent at the prior-restraint stage will in all likelihood lead to serious abuses by officials and judges; such a dangerous principle is advocated only because planned violence is so very harmful to innocent individuals and to society as a whole, and is so very

prevalent in the contemporary political climate. It is clear that safeguards against such abuse should be carefully constructed. Only a *specific* intent to cause violence, directed to the specific demonstration and manifested by specific plans, should suffice for a permit refusal or an injunction; a general intent extrapolated from rhetoric or previous exploits should not be enough. Concrete evidence should be required." V. Blasi, Prior Restraints on Demonstrations, 68 Mich. L.Rev. 1481, 1509 (1970). (Footnote omitted; emphasis in original.)

In attempting to meet its evidentiary obligations the Park District relied basically on past incidents involving the plaintiff.

■ On the basis of controlling precedent we can only conclude that such past violence, if relevant at all, must be extremely closely related in time and character to the permit for which the plaintiff applies. The law does not permit us to infer because a person has resorted to violence on some past occasions that he will necessarily do so in the future. That is what the Park District has attempted to do. However, it could cite only scattered instances of violence from a period more than one year prior to the present application.

In Kunz v. New York, *supra*, 340 U.S. at 294, 71 S.Ct. 312, the Supreme Court in pointed language referred to "appropriate public remedies" and in that sense distinguished prior restraints and subsequent punishments.

After a lengthy review of the pros and cons of the question of the use of past conduct, Professor Blasi concludes: "Moreover, even if this circumscribed consideration of past conduct at the prior-restraint stage did not have such serious drawbacks, there is a preferable alternative: If the right to demonstrate is to be limited on the basis of past conduct, this should be done at the sentencing stage as part of the punishment for the initial conduct. . . . A per-

mit never should be denied because of the past conduct of the applicant." V. Blasi, *supra,* 68 Mich.L.Rev. 1481, 1518–19 (1970).

■ However, we do not find it necessary to determine whether a person's past conduct can or cannot ever justify a denial of a speaker's assembly permit because here the factual situation as previously noted is not a predicate for a well-founded belief that violence would occur if the permit had been granted. The fact that plaintiff and/or his followers apparently had taken relish in breaking up downtown "peace rallies" is not indicative of how they would act at a rally in a neighborhood more sympathetic to them in which the bulk of their supporters resided. As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible in determining whether to grant permits.

■ Starting with Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), and continuing to Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed. 134 (1969), it has become patent that a hostile audience is not a basis for restraining otherwise legal First Amendment activity. As with many of the cases cited herein, if the actual behavior is not sufficient to sustain a conviction under a statute, then certainly the anticipation of such events cannot sustain the burden necessary to justify a prior restraint. In *Gregory* the demonstrators marching on the mayor's home were admittedly peaceful. Only the onlookers were unruly. The resulting arrests and convictions of the demonstrators for disorderly conduct for failure to disperse were summarily reversed. Although the reversal was based on the failure to show actual disorderly conduct on the part of the demonstrators, the Court did state clearly that "petitioners' march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." 394 U.S. at 112, 89 S.Ct. at 947.

Later in the same term, in reversing a conviction for flag-burning, the Court found it necessary to comment on the possibility that the conviction should be sustained on "the possible tendency of appellant's words to provoke violent retaliation." Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969). The Court found that the actions did not fit into the "fighting words" exception to the law enunciated in Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and then went on to state "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of the hearers." 394 U.S. at 592, 89 S.Ct. at 1366. This language was quoted with approval in Bachellar v. Maryland, 397 U.S. 564, 567, 90 S.Ct. 1312, 25 L.Ed. 570 (1970), in which a unanimous Court reversed a conviction on the ground that it could have been based on a finding that the petitioners had engaged in " 'the doing or saying or both of that which offends, disturbs, incites or tends to incite a number of people gathered in the same area.' " [quoting the trial judge's jury instruction] Bachellar v. Maryland, 397 U.S. at 565, 90 S.Ct. at 1313.

Recent lower court decisions have recognized the doctrine that it is impermissible even to consider the threat of a hostile audience when ruling on a permit application or a request for an injunction against a demonstration. Stacy v. Williams, 306 F.Supp. 963, 977 (N.D. Miss.1969) (three-judge court); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal.1965); Williams v. Wallace, 240 F.Supp. 100, 109 (M.D.Ala.1965); and Rockwell v. Morris, *supra,* a case whose facts certainly presented a high probability of violence. Here we do not even have to go that far for the showing of potential violence from hostile audiences at Marquette Park was nominal, at most.

Nor was there such a background of violence in the vicinity of Marquette Park that prior restraints might find some justification under the Supreme Court's decisions in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909), and Milk Wagon Drivers', etc., Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), both of which involved restraints on political and civil rights in a context of extensive labor violence. Some very narrow restrictions might be acceptable in the present case if there had been extensive disorder in the vicinity of Marquette Park, but there is no intimation of such a situation or condition in the record. Even such restrictions are to be severely limited as noted in Carroll v. President & Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), which found an *ex parte* restraining order void when there was clearly sufficient time to give the demonstrators notice of the hearing and a chance to present their case.

In sum, under none of the constitutionally permissible tests for prior restraints based on violence can the denial of a permit to plaintiff be upheld. Since, as set forth above, there was no valid ground for denial based upon the inappropriateness of such a meeting in Marquette Park, we are brought to the conclusion that the permit was unconstitutionally denied.

We must add, however, that none of what we have said prevents the prosecution of plaintiff or his followers if in the course of his speech they incite or start violence. On the contrary, the cases approving such procedure are numerous and are summarized in Rockwell v. Morris, *supra,* 211 N.Y.S.2d at 34. It is the prior restraint which is condemned.

Collin also challenges the facial constitutionality of the Park District permit ordinance.

Section 17–8.2(b) of the ordinance establishes the procedures for permit applications for public speeches and assemblies in Park areas open to the public. Applications to hold gatherings of 75 persons or more are to be in writing and

are to be filed with the Park District Director of Recreation.

Further procedure is then set forth in the ordinance as follows:

". . . the Director of Recreation (or his designated representative) shall have five days, excluding Saturdays, Sundays and legal holidays, from receipt of said application within which to grant or deny said permit. In the event of inaction or denial by the Director of Recreation (or his designated representative) within said five day period, excluding Saturdays, Sundays and legal holidays, the applicant shall be entitled to a review of his application by the General Superintendent upon the filing by the applicant of a written request therefor with the General Superintendent. The permit shall be deemed to be issued unless expressly denied with a statement of reasons therefor by the General Superintendent within five days, excluding Saturdays, Sundays and legal holidays, from receipt of said request for review."

At the outset we note that the procedure is cumbersome and lacking in elements which constitute due process. The ordinance as written allows the Park District to decide to take no action and give no notice to the applicant of its decision. While the ordinance does provide for the right to seek review after five days without a final decision of the director, information concerning this procedure is not communicated to the applicant and in one of Collin's prior applications he finally discovered the director's denial only after telephoning Park District officials. No reasons for denial are provided. Any attempt at review is taken without knowledge of the rationale for prior refusal of the proposed permit. It is necessary for an applicant to request a review hearing in ignorance of the matters upon which the

director initially based an "inaction" denial.

The district court observed in its memorandum opinion and order that the lack of providing adequate notice on the part of the Park District would have seemed to the court fatal were it not for what the court found to be the overwhelming evidence that the group for which the plaintiff was the representative provided such a danger and threat to the health and enjoyment of the park by the public that the Park District could not do anything but deny the execution.

The district court further observed that "due process of law in its fundamental requirements of notice and fair hearing contemplates reliable notice of the decision with relation to an application. . . ."[4] We agree.

Collin further contends, however, that the ordinance is unconstitutional on its face because it does not require the Park District to initiate review procedures on its own when an application is refused.

We are hesitant to impose on municipalities the necessity of resorting to court injunctive procedure every time it is decided that a permit for use of public property should properly be denied. Nevertheless, in the sensitive area of prior restraint of freedom of expression this is a necessary due process procedure.

The Supreme Court in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), struck down a movie censorship statute which did not provide for the censor to initiate litigation:

"The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure *requiring* a judicial determination suffices to im-

4. In oral argument, counsel for the Park District informed the court that certain changes had been made in Park District procedures to conform to the notice requirements discussed by the district court. This apparently is as a matter of practice and we are not aware that the ordinance itself has been accordingly amended.

pose a valid final restraint. [Citations omitted.] To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that *the censor* will, within a specified brief period, either *issue a license or go to court to restrain showing the film.*" 380 U.S. at 58–59, 85 S.Ct. at 739. (Emphasis added.)

In LeFlore v. Robinson, 434 F.2d 933 (5th Cir. 1970), *vacated on other grounds,* 446 F.2d 715 (5th Cir. 1971), the Fifth Circuit applied this requirement to a parade permit statute.

The Park District seeks to distinguish *Freedman* on the ground that the "free forum" system provides an alternative process "to obviate the concern expressed by these courts that the propitious opportunity for an assembly or demonstration will pass before a permit is granted." As noted above, this argument is based on the Park District's assumption that the "free forums" are an alternative to their obligation to grant Collin what is, on this record, his clear constitutional right to speak in Marquette Park. His First Amendment rights cannot be so easily negated. If he has a right to speak in Marquette Park, which we have found, then that right is what must be expeditiously protected as noted in *Freedman.*

"In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." Freedman v. Maryland, *supra,* 380 U.S. at 56, 85 S.Ct. at 737. The Court found in *Freedman* that this type of procedural challenge to the Park District ordinance was equivalent to the usual challenge for improper delegation since the immediate judicial review is necessary to avoid the vice of unconstitutional delegation.

As Mr. Justice Harlan pointed out in his concurring opinion in Shuttlesworth v. Birmingham, 394 U.S. 147, 163, 89 S. Ct. 935, 945, 22 L.Ed.2d 162 (1969),

". . . timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in advance would place a severe burden upon the exercise of his constitutionally protected rights."

An example of the verity of this pronouncement is found in the case before us in which Collin, who had to initiate judicial review, was unsuccessful at the district court level and was further unsuccessful when he attempted to secure a temporary injunction from this court pending the appeal.

■ We therefore hold the ordinance to be in violation of the First Amendment insofar as it fails to provide for adequate notice and a prompt final judicial decision where prior restraint is imposed upon the exercise of the freedom of assembly and freedom of speech.

For the reasons hereinbefore set out we reverse the judgment of the district court and remand this cause to the district court for further proceedings not inconsistent with this opinion.

Reversed and remanded

DUFFY, Senior Circuit Judge.

I respectfully dissent.

The principal issue before us is "Whether the denial of a permit to speak and assemble in a family picnic area in Marquette Park [in Chicago, Illinois] and an offer of an alternative site to speak and assemble in any one of four 'free forum' areas within the Chicago Park District, is an abuse of discretion within the constitutionally permissible duty and obligation of the Park District to regulate the time, place and manner of speech and assembly on park property" which the majority claims to be a violation of First Amendment

rights under the Constitution of the United States.

The Park District concedes "We must under constitutional law, concede his [Collin's] full and free right to speak and assemble without censorship or prior restraint somewhere on Park District property. In conceding this right, we have made locations available in four of the largest and most centrally located parks in Chicago, viz., Washington Park (South Side); Garfield Park (West Side); Lincoln Park (near North side and adjacent to Lake Michigan and the outer drive) and Burnham Park (near South side and adjacent to Lake Michigan and the outer drive)."

Area No. 3 in Marquette Park is used for a family picnic and recreation area in the spring, summer and fall. It customarily is used by children often accompanied by their parents or relatives, and never before has there been a permit granted for anyone to speak in Area No. 3. It was estimated by the Park District that between 200–500 people would be using the facilities of Area No. 3 on the date plaintiff desired to hold his assembly.[1]

In the letter of September 1, 1970, from the Park District to plaintiff, it was pointed out that the material which would be distributed by plaintiff in an area normally used for picnics and recreation purposes was similar to the kind previously distributed and which had resulted in public commotion which required police action and protection.

The Park District's letter did not deny the right of Collin or any other person to roam through the parks distributing literature. In fact, the District had ruled that no permit was needed if no assembly of persons was planned or contemplated.

The permit ordinance under which plaintiff acted was new in July 1970.

Under the ordinance, if a permit is denied, the reasons for the denial are sent to the applicant and he is advised of his right to appeal.

A document entitled "1969 Annual Report of the Midwest Division of the National Socialist White People's Party" was read into evidence. The document is signed by Frank Collin as "Midwest Coordinator." This document related several accounts of violence such as: April 5, 1959: "Two of our men holding signs which read 'Gas—The final Solution for Red Scum' and 'Gas Jew Traitors Rubin and Hoffman'" and then stated "As the procession of traitors neared the corner of State and Lake Streets, six National Socialists attacked the march. This was our baptism of fire. After only a few minutes of bloody fighting, dozens of the enemy lay broken in the street. . . . "

The report also listed under August 9, 1969: "Again we received national publicity when we demolished the summer's largest 'peace' parade with fists and fireworks before the crowd of thousands of State Street spectators."

It is apparent that Collin and his group have adopted the doctrine of affirmative violence. They apparently, are proud of their record of attacking and beating up men and women with whom they do not agree. Neither in the administrative hearing nor in the District Court was there any denial of their program of violence.

The District Court found "Rather than peaceful, the entire thrust of the organization seems to be devoted to the loathsome activity of race-baiting. Prior meetings have been attended by violence almost without fail, and the activities of the organization have been attended by violence almost without fail and the activities of the organization

---

1. The total area of Marquette Park is approximately 322.6 acres with grassy areas occupying about 25 acres. Area No. 3 which is the portion of the park plaintiff seeks as a forum is about ½ acre in size. Plaintiff never has listed or indicated an alternative site in Marquette Park, insisting on Area No. 3 in each application for a permit at times when the area normally is used by families and children for picnics and recreation.

seem to be dedicated to violent acts of one sort or another. . . . "

Another quote from Collin's Annual Report is "It was no accident that the first Hammer and Sickle flag in America was torn down by a National Socialist, and a fighter of only 16 years of age, at that. . . . "

Another paragraph ended with ". . . Give us the support we need, and we will give you back your free, White America. Men and women of the Home Front—support the FIGHTING FRONT."

In Shuttlesworth v. City of Birmingham, 394 U.S. 147 (1969) the Supreme Court, at page 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 quoted from Hague v. C.I. O., 307 U.S. 496, 515–516, 59 S.Ct. 954, 83 L.Ed. 1423 (1938): ". . . The privilege of a citizen of the United States to use streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

In Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965), Mr. Justice Goldberg, in his majority opinion, discussed the regulatory powers of a municipality with respect to First Amendment rights of free speech and assembly:

"This contention on the facts here presented raises an issue with which this Court has dealt in many decisions, that is, the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly. See Lovell v. Griffin, 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949]; Hague v. CIO, 307 U.S. 496 [59 S.Ct. 954, 83 L.Ed. 1423]; Schneider v. State, 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155]; Thornhill v. Alabama, 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; Cantwell v. Connecticut, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213]; Cox v. New Hampshire, 312 U.S. 569 [61 S.Ct. 762, 85 L.Ed. 1049]; Largent v. Texas, 318 U.S. 418 [63 S.Ct. 667, 87 L.Ed. 873]; Saia v. New York, 334 U.S. 558 [68 S.Ct. 1148, 92 L.Ed. 1574]; Kovacs v. Cooper, 336 U.S. 77 [69 S.Ct. 448, 93 L.Ed. 513]; Niemotko v. Maryland, 340 U.S. 268 [71 S.Ct. 325, 95 L.Ed. 267]; Kunz v. New York, 340 U.S. 290 [71 S.Ct. 312, 95 L.Ed. 280]; Poulos v. New Hampshire, 345 U.S. 395 [73 S.Ct. 760, 97 L.Ed. 1105].

From these decisions certain clear principles emerge. The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."

In discussing a somewhat similar case, the Supreme Court of Illinois stated that ". . . It seems manifest to us, however, that neither our own constitution nor the first amendment guarantees [sic] of the Federal constitution gives individuals the unqualified right to speak or distribute their writings in any manner and at any time or place chosen by them without regard to the consequences to others." Chicago Park District v. Lyons, 39 Ill.2d 584, 590, 237 N.E.2d 519, 523 (1969), cert. den. 393 U.S. 939, 89 S.Ct. 294, 21 L.Ed.2d 276. I agree.

The General Superintendent of the Park District had the duty to grant or deny an application for a permit to assemble and speak, in a family picnic area in a neighborhood park. It was his duty to consider whether the application was such that it would result in real

danger to the safety of other users of the park.

On the date of the hearing, the General Superintendent delivered to Collin's counsel a letter denying the application for a permit and suggesting, as an alternative place for the rally, one of the four forum areas. It is clear that this letter from the Superintendent does not deny Collin or any other person the right to roam through the parks distributing his literature. As stated heretofore, no permit is needed if there is no assembly contemplated. Furthermore, as indicated in the majority opinion, Collin has neither applied for nor has an alternative forum in Marquette Park been denied to him or to his followers.

In my view, the decisions of the Park Superintendent and of the District Court were predicated upon valid considerations of public safety and convenience in denying access of Picnic Area No. 3, Marquette Park, to Collin at a time when that area would be occupied by family groups. Furthermore, I feel the Park District ordinance hereinbefore discussed is constitutional. I would affirm.

### On Petition for Rehearing and Rehearing En Banc

PELL, Circuit Judge.

This matter is before the court on a petition for rehearing and suggestion for rehearing *en banc*.

In its petition for rehearing, the Park District prayed in the alternative, if the judgment of the district court was not affirmed, as follows:

"That if this Court finds on the issue that Collin and his group have a constitutional right to assemble somewhere in Marquette Park, that it reverse the judgment of the Court below, direct the Court below to enter its order upon Collin and the National Socialist Party of America similar to paragraphs 1, 2, 3, 5 and 10 of the order entered by this Court in the *Seese* case, with directions to the Park District to provide a suitable area in Marquette Park for Collin's assembly other than Area No. 3 on a date suggested by Collin.

"That if this Court holds that it can be a prior restraint upon freedom of speech and assembly for the Park District to refuse an application for speech and assembly in any specific park without offering another area in that park for such purposes, even though free forum areas are available in other parks within the District, that it require the Park District to initiate judicial review only in those cases where an application for a permit within a park is denied without an offer by the Park District of an alternative site within that park."

■ Of necessity, the opinion of this court dealt with the posture of the factual situation presented. We do not conceive it to be the function of the reviewing court to give advisory opinions in the nature of administrative guidelines for the determination of what may or may not be legitimate grounds for denial of a permit. The effect of the court's opinion was that the permit could not be denied in the particular factual situation before us.

■ Nevertheless, by way of clarification of our opinion, it does not purport to say that specified areas in a large park, or indeed an entire small park, cannot be exclusively designated for activities such as family picnicking or athletic endeavors provided that such exclusive designation is in fact that and not a device to permit some to speak and to assemble for other purposes and discriminatorily to screen out others.

Likewise, where an entire park, or a specified area in a park, has legitimately and by provably bona fide action been booked for a particular time by a particular group or organization so as phys-

ically to be incapable of accommodating another group or organization, subsequent application by a second group or organization obviously could not be granted.

 Further, the opinion does not preclude a denial of a permit for a requested area in a particular park where simultaneously there is made available an alternate site in the same park of equal potentiality for assembly and speech to that for which application was made. The four so-called free forum areas as demonstrated in the opinion did not meet this requirement.

 Also, the opinion does not interdict explicit prior regulation of the time at which park facilities will be available for assemblies, if consistently and nondiscriminatorily observed as to all applicants, and if not so narrowly drawn as to be in effect prohibitory or chilling of expression at reasonable times and of reasonable duration.

Nothing in our opinion compels needless resort to judicial procedures in situations such as those hereinbefore set forth. We do say, however, that there must be a buttressing judicial decision where prior restraint is imposed upon the exercise of the freedom of assembly and the freedom of speech in the absence of uncontestably valid grounds for denial, which have no constitutional implications.

The petition for rehearing is denied. A majority of the active judges having not voted for a rehearing *en banc*, the suggestion of rehearing *en banc* is also denied.

DUFFY, Senior Circuit Judge (dissenting).

I would grant the petition for rehearing for the reasons heretofore advanced by me in my dissent to the original majority opinion.