CHRISTIAN KNIGHTS OF THE KU KLUX KLAN INVISIBLE EMPIRE, INC., et al., Appellees,

v.

The DISTRICT OF COLUMBIA, et al., Appellants.

No. 90–5332.

United States Court of Appeals, District of Columbia Circuit.

Oct. 27, 1990.

Emergency Motion for Review of Preliminary Injunction (Civil Action No. 90–2615).

Herbert O. Reid, Sr., Corp., Counsel, Office of the Corp. Counsel, with whom Charles L. Reischel, Deputy Corp. Counsel, and Donna M. Murasky, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellant District of Columbia.

Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the brief, for appellees.

Jay B. Stephens, U.S. Atty., R. Craig Lawrence, Michael L. Martinez, John C. Cleary, and John D. Bates, Asst. U.S. Attys., Washington, D.C., were on the brief, for the U.S.

Before WALD, Chief Judge, EDWARDS and RANDOLPH, Circuit Judges.

ORDER

PER CURIAM.

Upon consideration of the emergency motion, the response thereto, the memorandum in support of the emergency motion, the response thereto, and all supporting submissions filed by the parties, it is

ORDERED that the order entered by the district court on October 25, 1990, be vacated and the case remanded for the reasons stated in the accompanying concurring statements.

The Clerk is directed to issue forthwith a certified copy of this order to the district court in lieu of formal mandate.

HARRY T. EDWARDS, Circuit Judge:

The District of Columbia appeals an order of the District Court compelling it to issue a permit authorizing the appellees, the Christian Knights of the Ku Klux Klan, to march from the Washington Monument to Capitol Hill on October 28, 1990. *See Christian Knights of the Ku Klux Klan Invisible Empire v. The District of Columbia*, 751 F.Supp. 212 (D.D.C.1990). The District of Columbia had agreed to issue a permit to the appellees allowing them to march over a shorter route; the appellees then sought an injunction compelling the District of Columbia to issue a permit allowing them to march the full

distance from the Monument to the Capitol. Upon receiving testimony and hearing arguments from both sides, the District Court granted the appellees' request.

In my view, the order entered by the District Court on October 25, 1990, must be vacated and the case remanded. Appellees have not demonstrated the requisite irreparable injury or likelihood of success on the merits to warrant the preliminary relief sought. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir.1958).

It should be noted at the outset that this case does not involve an effort by the District of Columbia to prohibit appellees' freedom of expression. Appellees have been given a permit to march and to demonstrate. Thus, the issue raised here is the extent to which the location of a demonstration can be regulated to deal with matters of public safety and other considerations.

Appellants' issuance of a parade permit for October 28, 1990, allowing appellees to march down Constitution Avenue in Washington, D.C. from 7th Street to 3rd Street, N.W., rather than issuance of a permit for the full requested route extending from 14th Street to 3rd Street, N.W., does not constitute irreparable harm for the appellees. Appellees will have the opportunity to convey their message along the approved route and at a permitted demonstration on the Capitol grounds. The District Court noted that "the route along Constitution Avenue for demonstrations assembling at the Monument and demonstrating at the Capitol is a traditional segment of the Nation's premier public forum." This appears undisputed. However, according to an affidavit submitted by Thomas Carroll, Deputy Chief of the Metropolitan Police Department ("MPD"), "the [Police] Department as a matter of practice coordinates with permit requestors relative to such matters as march route, march length, time and duration of march." Thus, appellants have indicated that modification of the requested route was consistent with normal permitting procedures. The District Court made no findings on this point.

Appellants assert that, given the circumstances of this case, the MPD modification of appellees' permit application is reasonable; in particular, appellants cite the relatively small size of appellees' march, the extraordinary risk of violence, the lack of manpower to police the streets during the demonstration and the huge expense and disruption that would be caused by a march along the full route preferred by appellees. The District Court's opinion in no way suggests that the MPD findings were somehow inaccurate or that they were merely a subterfuge to cover some impermissible motive. Indeed, neither the District Court nor appellees appear to dispute appellants' assertion, in a letter written by Isaac Fulwood, Jr., Chief of the MPD, that "the parade creates a substantial possibility of violent disorderly conduct likely to endanger public safety or to result in significant property damage." Appellants also asserted that they "could not adequately ensure public safety for the length of the [parade] route proposed." Although the United States disputed this latter contention, the District Court made no findings on the point.

Thus, on the record that has been developed to date, there is nothing to indicate that the factors considered by appellants in issuing the permit were impermissible. The sole authority cited by the District Court to support its finding of irreparable harm is *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a patronage dismissal case in which petitioners' First Amendment rights were totally denied by the disputed Government action. This is not such a case. Appellees have been given a permit to march and to demonstrate over a route and on grounds traditionally made available to permit holders. The parade route is shorter than the one often made available to demonstrators, but appellants say that the modification is consistent with MPD permitting procedures; appellants also assert that the factors considered in this case are usual and reason-

able. Appellees must show otherwise in order to prevail in their case on the merits. For now, however, there is no showing of irreparable harm.

In assessing the merits of appellees' claim, the District Court properly considered the so-called "heckler's veto" cases. Under this line of authority, it has long been held that "a hostile audience is not a basis for restraining otherwise legal First Amendment activity.... [I]t is impermissible even to consider the threat of a hostile audience when ruling on a permit application...." *Collin v. Chicago Park Dist.,* 460 F.2d 746, 754–55 (7th Cir.1972); *see also NAACP Legal Defense & Educational Fund, Inc. v. Devine,* 727 F.2d 1247, 1261–62 (D.C.Cir.1984) (to consider the intense hostility would be to "allow the intolerance (and threats) of a vocal minority (or even the majority) to determine who shall and who shall not speak"), *rev'd on other grounds sub nom. Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). For several reasons, these cases are not dispositive of the issues before us.

First, as noted above, appellees have proceeded in this case on the assumption that permit holders *always* are allowed to parade the full distance from the Monument to the Capitol, without regard to any other considerations; appellants dispute this contention and the District Court has made no findings on the point.

Second, it appears that the "heckler's veto" cases cited by the District Court and appellees all have involved situations in which petitioners have been *totally denied* an otherwise available forum for expression; that is not this case. Appellees' argument might be compelling if they could at least show that the *only* reason that they have been denied a permit to parade the preferred distance is the threat of violence, and that absent this threat they would have been granted the permit sought; but that proof is not in the record as it presently stands.

Finally, even the United States, in its submission in support of appellees, is unwilling to say that threats of violence *never* may be considered in the assessment of permit applications. Nor can this court assume that the "heckler's veto" decisions must be read to go this far, especially in light of indications from the Supreme Court that the concern for public safety is a proper Government interest. *Compare Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.") *with Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("Subject to ... reasonable regulation, ... peaceful demonstrations in public places are protected by the First Amendment. Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.") (footnote omitted) *and Cox v. State of New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941) ("The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need.").

At this juncture in this litigation, it is unnecessary for us to attempt to reconcile the foregoing lines of authority, or to assess the extent to which the MPD must go in spending public funds to protect demonstrators, hecklers or bystanders in light of a perceived threat of violence. *Cf. Belknap v. Leary,* 427 F.2d 496, 498 (2d Cir. 1970) ("Responsibility for protecting the people of the City of New York in the exercise of their First Amendment right[s] ... rests in the first instance on their elected Mayor and his designee, the Commissioner of Police." Absent evidence of bad faith or an abdication of that responsibility, courts should hesitate to intervene.). We can offer no judgment on these issues until

we have clear findings from the District Court on whether the threat of violence is truly real, substantial and beyond reasonable control, as well as findings on the other disputed facts mentioned above.

RANDOLPH, Circuit Judge, concurring:

The district court's order should be vacated as an abuse of discretion and the case remanded.

The Ku Klux Klan needs more than a permit to march down Constitution Avenue. It needs police protection and plenty of it. When the Klan tried to march along this route on September 2, 1990, it got nowhere. The police had trouble controlling the mob and the Klan headed for the Capitol in a heavily-guarded convoy.

The Klan wanted to try again and asked the District of Columbia to issue another marching permit. The city did so, but made two adjustments. It shortened the route from eleven blocks to four and greatly increased the number of officers assigned to the event. Both measures were undertaken for the purpose of facilitating the march by protecting the participants and onlookers from violence the authorities reasonably anticipated. As matters stood before the district court issued its order, the Metropolitan Police Department (MPD) had allocated more than one half of its entire force to this march, a total of 2,500 law enforcement officers, 1,500 of whom would stand shoulder-to-shoulder on both sides of Constitution Avenue from 7th Street to 3rd Street. This massive commitment has stretched the MPD to its limit.

The Klan nevertheless desires to start its march seven blocks away, at 14th Street rather than 7th Street. But according to the Deputy Chief of the MPD, that would require at least 1,000 more officers to secure the expanded route and the MPD cannot spare them.

The district court has permitted the Klan to march from 14th Street regardless of whether the additional officers can be rounded up. The idea must be that as far as safety is concerned, the police will just have to do the best they can and if the Klan's members are foolhardy enough to march without adequate police protection, that is their business. But it is not simply the Klan's business. Maintaining public order and preventing violence are the concerns of government. The march will take place in an area containing museums and other attractions to visitors. Their safety and the safety of everyone who might be in the vicinity of this event is at stake. If protection of the public and the participants can reasonably be assured only by shortening the distance of the march, the First Amendment does not forbid that measure.

The district court's basic mistake was in relying on decisions holding that the hostile reaction of an audience cannot justify a total ban on speech. Those decisions have nothing to do with this case. There will be no prohibition of speech. The Klan can make its point whether its members march one mile or two. But the Klan's members will not be able to take a single step without police protection. How many steps they should be permitted to take must depend on how many officers can reasonably be mustered. That is the reality, and the Supreme Court has long recognized that the place and manner of presenting speech can be regulated in light of the probability that it will provoke a violent response. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972); *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); and *Boos v. Barry*, 485 U.S. 312, 331–32, 108 S.Ct. 1157, 1169–70, 99 L.Ed.2d 333 (1988), are but three examples among many.

The permit allowing a march from 7th Street to 3rd Street thus constituted a regulation of the place where speech will occur and should have been tested by the standards the Supreme Court has developed for such situations. Regulations of this sort must be justified without regard to the content of the speech, must be narrowly tailored to serve a compelling governmental interest and must leave open an ample alternative channel of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative*

*Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984).

The permit granted to the Klan satisfies these standards. It merely shortens the distance of the Klan's march, thus leaving open the channel of communication the Klan has chosen. It is narrowly tailored to serve the compelling governmental interest of maintaining the peace because it reflects the authorities' best estimate of the area they can reasonably secure with the resources available to them. The regulation is "content-neutral": the District of Columbia did not restrict the distance of the march "because of disagreement with the message presented." *Clark,* 468 U.S. at 295, 104 S.Ct. at 3070; *see also Boos v. Barry,* 485 U.S. at 320, 108 S.Ct. at 1163. It restricted the distance because, having charged 2,500 officers with the duty of ensuring that the march would go forward along the prescribed route, it had no more officers available.

The short of the matter is that safety must be taken into account in regulating the time, place and manner of parading and marching on Constitution Avenue. On the basis of the district court's logic, however, the Klan could demand to parade the entire length of that thoroughfare and the city could do nothing but accede. It may be that the route from 14th Street to 3rd is the customary one for marches and parades, but that does not preclude reasonable time, place and manner restrictions on its use. The case would be different if there were evidence that the authorities discriminated against the Klan on some improper basis. But there is no such evidence. The record before us shows instead government officials conscientiously trying to perform their duty to preserve the peace while accommodating those who could not exercise their freedom to march without the government's protection. *See Belknap v. Leary,* 427 F.2d 496, 498 (2d Cir.1970). The First Amendment demands no more.

WALD, Chief Judge, dissenting:

I would affirm the district court's order requiring that the petitioners be allowed to follow the traditional march route. I am

satisfied that the trial judge found that the route from the Monument along Constitution Avenue to the Capitol was a "traditional segment of the Nation's premier public forum." *Christian Knights of the Ku Klux Klan Invisible Empire v. The District of Columbia,* 751 F.Supp. 212, 214–15. The affidavits of the petitioners' and United States' police experts support that finding, and no evidence disputes the presumptive right of demonstrators for decades to utilize that route.

That right is denied here on the ground that the threat of violence by those opposed to the petitioners' view makes it impossible for the combined forces of the Metropolitan Police Department ("MPD") and the Park Police to safeguard the demonstrators and onlookers. The trial judge found, however, that case had not been made out, and the United States supports that position as well. The evidence in the record establishes that the MPD has been able to handle major demonstrations in the past with a large potential for violence without curtailing the traditional route. *See* Declaration of Robert Klotz at 5 (stating that as a retired MPD official, he finds the MPD's claim "bewildering" because the MPD has enough personnel to handle this demonstration as it has handled other "potentially large and violent" demonstrations such as the 1980 demonstrations involving Iranian students).

First Amendment law does not permit curtailment of the right to march on a traditional parade route based on claims that even after the MPD has made a heavy commitment of its 5,000–person force, there would remain the possibility of violence against the few hundred marchers expected. *See, e.g., Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) ("Speech is often provocative and challenging.... That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance, or unrest.") (internal citations omitted); *Beckerman v. Tupelo,* 664 F.2d 502, 510 (5th Cir.1981) ("The existence of a hostile audience,

standing alone, has never been sufficient to sustain a denial of ... First Amendment rights.... [t]he fact that some speech may stir listeners to disagree—perhaps even to disagree violently—does not by that fact alone permit regulation.") (internal quotations omitted). To permit a two-thirds curtailment of a traditional parade route on that showing alone invites similar action against future controversial paraders of all views.

However reprehensible or provocative the view of particular groups may seem to many or most of us, their right to parade peaceably remains the most important bulwark of a democratic government against tyranny. If eleven blocks can be cut to four because of anticipated public reaction to one group, four blocks can be cut to one because of an even greater antipathy to the next group (and the acknowledgedly heavy pressures on local police), and then the parade is suddenly over before it begins. I agree with the district court (and the United States) that there is not sufficient justification for the severe curtailment of the traditional route imposed here, and I see no reason to overrule the district court's judgment on the record before us.